Hudson T. HARRISON and Harrison Construction, Inc., a corporation,

v.

DEAN WITTER REYNOLDS, INC., a corporation, John M. Carpenter, and John G. Kenning, Defendants.

No. 86 C 8003.

United States District Court, N.D. Illinois, E.D.

June 28, 1989.

---

Thomas P. Ward, Eugene H. Ruark, Chicago, Ill., for plaintiffs.

Paul B. Uhlenhop, Jeffrey H. Fradkin, Christopher Stuart, Charles J. Risch, Lawrence, Kamin, Saunders & Uhlenhop, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiffs Hudson T. Harrison and Hudson T. Harrison, Inc. have sued Dean Witter Reynolds, Inc. ("Dean Witter") and two of its broker-dealers, John M. Carpenter

and John G. Kenning, under § 10(b) of the Securities Exchange Act of 1934 ("the Securities Exchange Act"), 15 U.S.C. § 78j(b) ("§ 10(b)"), § 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a) ("§ 20(a)"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., and a number of state laws. Dean Witter has moved for summary judgment on all claims.

## DISCUSSION

This case contains two stories. The first story is about Dean Witter, and how it allowed Kenning and Carpenter to use its name and its office as part of a massive scheme to defraud investors. The second story is about Harrison, about how he threw millions of dollars at Kenning and Carpenter in the hopes of securing spectacular returns with no risk, and found himself millions of dollars poorer for his greed. Viewing all facts most favorably for Harrison, here's what happened.

*Dean Witter's Story*

Dean Witter's story begins back in mid–1983, when Kenning and Carpenter left the employ of a Florida branch of Prudential–Bache Securities, Inc. under questionable circumstances involving a failed complex securities transaction. Within weeks, a Dean Witter Florida branch office hired the two, after conducting an investigation into the affair and after the New York Stock Exchange approved Kenning's application for transfer of his broker-dealer registration.

Richard Frost, the local Dean Witter branch manager, made Kenning a vice president and account executive. Carpenter, who was not registered, became Kenning's assistant and established an account in his own name at Dean Witter. Kenning controlled the account, and had Carpenter establish it primarily because Kenning was facing bankruptcy. Frost's signature was required on any order ticket for the account.

Carpenter and Kenning soon began accumulating huge sums in Carpenter's account by soliciting clients to become involved in municipal bond deals. They told their clients that the funds would be pooled and used to purchase these low risk bonds at substantially reduced prices and commissions—discounts available, they said, because they were Dean Witter employees and because of the large sums of money involved. As it turns out, however, Carpenter and Kenning did not invest in municipal bonds at all, but instead in high-risk put options.

Not only were Carpenter and Kenning lying about what they were doing, but they were blatantly violating Dean Witter rules prohibiting employees from commingling their own funds with client funds and from sharing an interest in an account with anyone other than a close relative. By August, 1984, Carpenter and Kenning had displayed an uncanny ability for losing money, having amassed nearly $600,000 in losses since starting with Dean Witter. In August, Dean Witter's regional manager, Haskell Adler, met with Kenning's former Prudential–Bache supervisor, who informed Adler that Kenning could not be trusted. Adler did nothing with the information.

In addition, on a number of occasions Alfred Rauschman, the head of Dean Witter's compliance department, contacted Frost to inquire about the heavy volume of trading taking place in Carpenter's account. Dean Witter's internal rules require supervisors to ensure that an employee's investments are commensurate with his resources. Frost questioned Carpenter and Kenning about their activities, but when Carpenter explained that the money was his own, Frost looked no further, demanding only that Carpenter have cash on hand for every purchase he made. Although Dean Witter rules prohibit employees from receiving checks in their own names, and require branch managers to screen all incoming and outgoing correspondences, Carpenter and Kenning avoided discovery of their scheme by having their clients send them money either at home or to their personal bank accounts.

By June, 1986, Kenning and Carpenter had amassed losses of more than $2,000,-000 in the Carpenter account, as well as

having paid substantial commissions to Dean Witter for the thousands of trades they had made. At this point, the house came tumbling down, with Kenning and Carpenter admitting their wrongdoing to their clients as well as Dean Witter.

### Harrison's Story

Harrison's story begins in February, 1985, with Kenning and Carpenter still actively engaged in their fraudulent scheme. At this time, Harrison, an Illinois millionaire with considerable investment experience, traveled to Florida with his friend, John Cahoon. There he met Carpenter for the first time and stayed at Carpenter's home. During the trip, Cahoon and Carpenter mentioned the bond deals which Carpenter and Kenning were offering to their larger clients. Before leaving Florida, Harrison expressed an interest in the deals.

Upon returning to Illinois, Harrison received a call from Kenning or Carpenter asking him if he wanted to participate in the bond deals. Over the next few weeks, the two Dean Witter employees spoke with Harrison on a number of occasions and explained that the bond deals would require Harrison to provide Kenning and Carpenter with funds which they would then place in their own accounts at Dean Witter. They would use these funds to purchase municipal bonds, nearing maturity, at a substantial discount. Harrison would earn some interest in the period before maturity, and then a large gain when the bonds were redeemed at par value. The discounts, the two told Harrison, were not available in transactions out of a customer's account.

Harrison made his first investment of $200,000 with Kenning and Carpenter on February 28, 1985, and over the next 16 months, 15 additional investments totaling approximately $2.8 million. Harrison also made two investments, totaling $1.1 million, out of HCI funds. At Carpenter's request, Harrison made two of these investments by wire transfer to Carpenter's personal checking account, and the rest by mailing checks to Carpenter at his home address.

In return for the investments, Carpenter and Kenning provided Harrison with what were fashioned to be personal promissory notes, but which Harrison believed were receipts for his bond purchases. The due dates of the notes generally coincided with the due dates of the bonds. The notes provided for Harrison to receive at the due date an interest rate commensurate with the return Harrison expected to receive on the bond deals. On an annualized basis, these notes contained interest rates ranging from approximately 18% to 60%. Dean Witter's name did not appear on any of the notes, and Harrison never received any confirmation or statement from Dean Witter regarding his investments with Kenning and Carpenter.

Through July, 1986 Carpenter repaid out of his personal checking account and in cash approximately $800,000 to Harrison and HCI. Harrison believed these payments represented profit generated from his interest in the municipal bonds, though Carpenter provided him with tax forms stating that Harrison and HCI had received interest income from Carpenter. Harrison also declared $46,296.51 on his 1985 tax return as interest income on the monies he had given Carpenter for bond investments during 1985.

In July, 1986, Carpenter and Kenning flew to Illinois to inform Harrison that they had lost all of Harrison's money. When Harrison asked how they could have suffered such losses in municipal bonds, Carpenter informed him that they had been investing his money in far riskier instruments. Carpenter offered to establish a plan for repaying Harrison, but when he failed to produce such a plan in writing, Harrison sent letters to Carpenter and Kenning demanding immediate payment of all money due himself and HCI. Harrison did not notify Dean Witter of his losses, nor demand payment from Dean Witter, until he filed his lawsuit.

### DISCUSSION

Of the 11 counts remaining in Harrison's 12–count first amended complaint,[1] nine—

one § 10(b) claim, one RICO claim, and seven state law claims[2]—seek to impose liability against Dean Witter vicariously for the acts of Kenning and Carpenter. One claim, a negligence claim, alleges that Dean Witter itself—that is, Dean Witter's management level personnel, *see D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 967-68 n. 5 (7th Cir.1988)—violated Harrison's rights. And one claim, a § 20(a) claim, involves a combination of the two. The court will address these theories of liability seriatim, cognizant of the fact that it may grant summary judgment for Dean Witter only if there remain no genuine issues of material fact requiring trial. Fed.R.Civ.P. 56(c).

*Respondeat Superior*

Dean Witter does not deny that Kenning and Carpenter engaged in numerous illegal acts during the course of their employment with the securities firm. Under the common law doctrine of respondeat superior, Harrison may hold Dean Witter vicariously liable—that is, liable without fault—for its employees' violations of § 10(b),[3] RICO,[4] and state law, provided that he can show either that Kenning and Carpenter had actually authority to do what they did, or that the two had the apparent authority to do it. *See generally Rosenthal & Co. v. Commodity Futures Trading Commission*, 802 F.2d 963 (7th Cir.1986).[5] Whether they had such authority is a " '[question] of fact,

to be decided by the trier of fact,' unless the relationship [or absence thereof] is 'so clear as to be undisputed.' " *Rankow v. First Chicago Corp.*, 870 F.2d 356, 359 (7th Cir.1989) (quoting *St. Ann's Home for the Aged v. Daniels*, 95 Ill.App.3d 576, 579, 51 Ill.Dec. 64, 420 N.E.2d 478 (1981)).

A. Actual Authority

Harrison first argues that Dean Witter may be held liable for the acts of Kenning and Carpenter because the two were authorized to sell municipal bonds to customers and that is precisely what they were doing. The fact that they subsequently misused the funds, Harrison contends, does not alter the fact that Kenning and Carpenter were doing what they were authorized to do.

Of course, Kenning and Carpenter were not really selling municipal bonds at all. But that is what they were offering to Harrison, and that is what he thought he was purchasing. Under settled principles of respondeat superior, an employee who does what he is authorized to do binds his employer even if the employee acts with an improper purpose and ultimately cheats both his employer and the third person. Restatement (Second) of Agency § 165, Comment e; *id.* at § 257, Comments a, d; *see Congregation of the Passion, Holy Cross v. Kidder Peabody & Co., Inc.*, 800 F.2d 177, 184 (7th Cir.1986).

1. In an earlier ruling, this court dismissed one of Harrison's two RICO claims, a § 1962(c) claim, on the grounds that Dean Witter could not be held liable vicariously under this subsection for the acts of lower level employees such as Carpenter and Kenning. *Harrison v. Dean Witter Reynolds, Inc.*, 695 F.Supp. 959 (N.D.Ill. 1988).

2. The seven state law claims include: default on promissory notes; common law fraud; breach of fiduciary duty; breach of contract; breach of covenant of good faith; conversion; and violation of Florida law.

3. Because § 20(a) provides for a form of vicarious liability against securities firms, *see post* at ——––——, some courts have held that § 20(a) precludes the application of common law respondeat superior. *See generally* Fitzpatrick & Carman, Respondeat Superior and the Federal Securities Laws: A Round Peg in a Square Hole,

12 Hofstra L.Rev. 1 (1983). The Seventh Circuit, however, has held that both § 20(a) and common law vicarious liability principles apply in securities fraud cases. *Henrickson v. Henrickson*, 640 F.2d 880, 887 (7th Cir.1981).

4. In this court's earlier ruling, it was noted that the Seventh Circuit has created some ambiguity as to whether vicarious liability applies to § 1962(a) claims. The court need not pursue this matter since, even if vicarious liability is available, Harrison cannot obtain it here.

5. Although Dean Witter's vicarious liability for the state law claims is governed by Illinois law, whereas its vicarious liability under the federal claims would presumably be determined by federal principles, this court (as did the parties) will rely on federal and state cases interchangeably inasmuch as there is no discernible distinction among them on the legal issues presented here.

The flaw in Harrison's position, however, lies in the fact that Kenning and Carpenter were not authorized to sell municipal bonds in the manner they (purportedly) were selling them to Harrison, for Dean Witter's internal rules forbid employees from commingling their own funds with those of customers and from using customer funds to make purchases out of employee accounts. Had Dean Witter authorized its employees to offer bond deals of the sort Kenning and Carpenter were offering, it could not have escaped liability when the two misused Harrison's money. But because Dean Witter expressly prohibited these types of deals, Harrison cannot prevail under the principles of § 165.

Still, the actual authority prong of the doctrine of respondeat superior goes further than § 165. An employer is liable not only for acts it specifically authorizes its employee to do, but also for the acts of an employee within the scope of his employment. Restatement (Second) of Agency, §§ 216, 219(1); *see also Henrickson v. Henrickson*, 640 F.2d 880, 887–88 (7th Cir. 1981); *Lynch v. Board of Education*, 82 Ill.2d 415, 424–25, 45 Ill.Dec. 96, 412 N.E. 2d 447 (1980).

In cases involving intentional wrongdoing, the scope of employment doctrine acquires something of an abstract quality, for such wrongdoing is never really within the scope of an employee's employment: if it were, then the employer's liability would be direct, not vicarious. *See* Restatement (Second) of Agency, § 212 & Comment a; *cf. Pomer v. Deere & Co.*, 875 F.2d 1262, 1266 (7th Cir.1989). In determining whether an employer is liable for the wrongdoing of an employee, the analysis becomes one of degree: Just how related must the wrongdoing be to the nature of the employee's work before the wrongdoing itself falls within the scope of the employment?

In defining the boundaries of this doctrine, courts have looked to the rationales for it. These include: the equity consideration that the employer obtains benefits from the employee's legitimate work and thus should pay when the employee goes astray; the deterrence objective of providing employers with the incentive to keep their employees in line; and the compensatory function of imposing liability on the one, as between the innocent injured and the innocent employer, who can best absorb the costs of the employee's wrong. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser on Torts* § 69, at 500–01 (5th ed. 1984); Restatement (Second) of Agency, § 217, Comment a. The general rule is that an employee acts within the scope of his employment for respondeat superior purposes when his conduct "(a) ... is of the kind he is employed to perform; (b) ... occurs substantially within the authorized time and space limits; [and] (c) ... is actuated, at least in part, by a purpose to serve the master...." Restatement (Second) of Agency, § 228; *Prosser on Torts, supra,* § 70 at 502.

A jury could find that the acts of Carpenter and Kenning were of the kind they were hired to perform. Unlike § 165, which provides for liability only when the act is specifically authorized by the employer, § 229 of the Restatement provides that an act is of the kind an employee was hired to perform if the act is similar to those he was authorized to do and *inter alia,* if the employer "has reason to expect that such an act will be done." Restatement (Second) of Agency, § 229(f); *see Rosenthal & Co. v. Commodity Futures Trading Commission,* 802 F.2d at 968–69. Thus, an act may be within the scope of employment even if it was specifically prohibited by the employer. Restatement (Second) of Agency, § 230 ("An act, although forbidden, or done in a forbidden manner, may be within the scope of employment.");[6] *see Marbury*

**6.** Dean Witter's reliance on *Old Security Life Insurance Company v. Continental Illinois National Bank,* 740 F.2d 1384 (7th Cir.1984), proves only partially helpful here. Although the Seventh Circuit there stated that "[a]n agent has no authority to act contrary to the known wishes and instructions of his principal," *id.* at 1391, that case involved a contract-type claim and thus was subject to different vicarious liability standards than apply in cases involving tortious conduct. Thus, while the case does assist Dean Witter with respect to Harrison's contractual claims, it does not protect Dean Witter on the bulk of Harrison's complaint.

*Management, Inc. v. Kohn,* 629 F.2d 705, 716 (2d Cir.1980). Dean Witter hired Kenning and Carpenter to sell securities, and the facts suggest that it closed its eyes to the brokers' use of customer funds out of Carpenter's account.[7] These facts weigh in favor of finding the brokers' activities here to be within the scope of their employment.

■ What saves Dean Witter are the second and third elements in the analysis. Though Carpenter and Kenning received telephone calls at their office from Harrison, their relationship with Harrison took place primarily outside the office. Most significant, they received checks from him at home, received wire transfers to their personal bank accounts, and intentionally sought to avoid the oversight of Dean Witter supervisors. *See* Restatement (Second) of Agency, § 234; *cf. Bolwin v. El Kay Manufacturing Co.,* 32 Ill.App.3d 138, 336 N.E.2d 502 (1975) (no respondeat superior liability where agency relationship was temporarily discontinued when tort occurred). Likewise, while Kenning and Carpenter paid commissions to Dean Witter out of the purchases they made with Harrison's money, no reasonable jury could find that they sought through their activities to benefit Dean Witter. On the contrary, their actions demonstrate a conscious plot to prevent Harrison from becoming a Dean Witter customer, and to use Harrison's funds for their own purposes. *See* Restatement (Second) of Agency, § 235; Notes, Rule 10b-5—The Equivalent Scope of Liability Under Respondeat Superior and Section 20(a)—Imposing a Benefit Requirement on Apparent Authority, 35 Vand.L. Rev. 1383, 1398 (1982) ("proper focus is upon the employee's state of mind"). Thus, even if a jury could find that the fraudulent scheme involved some activities of the kind Kenning and Carpenter were permitted to perform, it could not find that they were acting within the scope of their employment in the conduct of this scheme.

### B.  Apparent Authority

When an employee acts outside the scope of his actual authority, his actions still may bind his employer if the employer "create[s] an appearance that the acts are authorized." *Rosenthal & Co. v. Commodity Futures Trading Commission,* 802 F.2d at 966. Actual authority depends on the employer's relationship with the employee. Apparent authority, by contrast, turns on the employer's relationship with the injured. Where the employer's actions give the injured reason to believe that the employee is acting within his authority, the employer is bound by the employee's acts even if the employee actually lacked such authority. *See American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 565–68, 102 S.Ct. 1935, 1942–43, 72 L.Ed.2d 330 (1982); Restatement (Second) of Agency, § 261.

Harrison argues that Kenning and Carpenter had the apparent authority to offer the municipal bond deals on behalf of Dean Witter because they were Dean Witter employees, because they provided Harrison with a Dean Witter phone number at which to contact them, and because Dean Witter allowed the scheme to continue for a substantial period of time without notifying Harrison that something was amiss. He notes that an employer need have had no direct contact with the injured, so long as the authority he granted the employee reasonably suggest that the employee had the authority to do the unauthorized acts. *See Alterman v. Lydick,* 241 F.2d 50, 53 (7th Cir.1957).

All this being true, Harrison cannot escape summary judgment here. An underlying predicate of any apparent authority theory is that " 'from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.' " *American Society of Mechanical Engineers, Inc. v. Hydro-*

---

7. Although Dean Witter's alleged negligence in not properly supervising Kenning and Carpenter is not relevant to the *respondeat superior* theories, the facts underlying this claim are relevant to the scope of the brokers' authority. A jury could find that Frost's minimal efforts to detect the source of their funds led them to believe that Dean Witter really did not care from where they got their money so long as they paid cash for each option purchase.

*level Corp.*, 456 U.S. at 566, 102 S.Ct. at 1942 (1982) (quoting Restatement (Second) of Agency, § 261, Comment a, p. 551). Apparent authority is an equitable doctrine designed to prevent injury to an innocent injured. When an individual has notice that an employee is exceeding the scope of his authority, the individual cannot rely on the employee's manifestations alone and then claim apparent authority. Restatement (Second) of Agency, § 262 & Comment c; *see Holloway v. Howerdd*, 536 F.2d 690, 696 (6th Cir.1976). He must undertake some reasonable efforts to determine whether the employee has the authority he says he does. *Evanston Bank v. Conticommodity Service, Inc.*, 623 F.Supp. 1014, 1032 (N.D.Ill.1985).

■ Harrison's transactions with Kenning and Carpenter were anything but regular. Kenning and Carpenter told him that he could not open an account with Dean Witter, that he should mail or wire all payments to them personally, and that he would be receiving discounts available only to Dean Witter employees. Further, Harrison never received a single receipt, statement or other communication bearing a Dean Witter heading or the signature of anyone at Dean Witter. Thus, even if Harrison truly believed that he was a Dean Witter customer (and this much is open to serious question), he had an obligation to inquire further into the authority of Kenning and Carpenter to offer the bond deals on Dean Witter's behalf. Since he concedes that he did not do so, no reasonable jury could find Dean Witter liable under an apparent authority theory. Dean Witter is entitled to summary judgment on Harrison's respondeat superior claims.

**8.** Harrison also makes two other arguments against the application of the economic loss doctrine here, but neither merits much discussion. First, he argues (without citation) that he is seeking damages beyond mere economic loss because, in addition to profits, he requests the recovery of funds invested with Dean Witter. Yet, *Rankow v. First Chicago Corp.*, 870 F.2d 356 (7th Cir.1989), held that precisely such damages were economic losses within the scope of the doctrine. *See also First National Bank of Boston v. Hitoshi Une*, No. 87 C 10831, 1988 WL 130050

### Negligence

Harrison predicates his negligence claim on Dean Witter's hiring and supervising of Kenning and Carpenter. According to Harrison, Dean Witter never should have hired the two brokers, and once it did, the firm should have supervised them to prevent them from defrauding Dean Witter customers. Dean Witter has moved for summary judgment on two grounds: that the Illinois economic loss doctrine precludes Harrison from bringing a negligence claim for his losses, and that, in any case, Dean Witter had no duty to Harrison because he was not a Dean Witter customer.

#### a. The Economic Loss Doctrine

■ Dean Witter contends that Harrison may not pursue his negligence claim because he seeks to recover purely economic losses—i.e., the money he invested with Carpenter and Kenning plus interest—and Illinois prohibits suing in tort for such losses. Harrison disagrees, arguing that the Illinois economic loss doctrine does not apply to the negligent performance of professional services.[8]

In *Moorman v. National Tea Company*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), the plaintiff sued the manufacturer under strict liability, innocent misrepresentation, and negligence when a steel grain storage tank developed a large crack. The Illinois Supreme Court dismissed all three claims, holding that a plaintiff suing for economic losses—i.e., " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property,' " *id.* at 82, 61 Ill.Dec. 746, 435 N.E.2d 443 (quoting Note, Economic Loss in Prod-

1988 U.S.Dist. LEXIS 13416 (N.D.Ill.1988) (money extended as credit, both principal and interest, fall within economic loss doctrine); *Bane v. Ferguson*, 707 F.Supp. 988, 998 (N.D.Ill.1989). Second, he argues that claims of negligent misrepresentations against those in the business of supplying information do not fall within the doctrine. This is true (see the discussion in the text below), but does not help Harrison since he is not suing Dean Witter for making negligent misrepresentations.

ucts Liability Jurisprudence, 66 Colum.L. Rev. 917, 918 (1966)—generally must bring his claims in contract rather than tort. The Court, however, noted two kinds of cases in which the recovery of economic loss had been permitted: "where one intentionally makes false representations (*Soules v. General Motors Corp.*, 79 Ill.2d 282 [37 Ill.Dec. 597, 402 N.E.2d 599] (1980)), and where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations. (*Rozny v. Marnul*, 43 Ill.2d 54 [250 N.E.2d 656 (1969) )." *Moorman*, 91 Ill.2d at 88–89, 61 Ill.Dec. 746, 435 N.E.2d 443.

*Moorman* was a products liability action, and was predicated, at least in part, on the extensive framework the Uniform Commercial Code provides for dealing with economic losses caused by defective products (*see id.* at 78–79, 88, 61 Ill.Dec. 746, 435 N.E.2d 443). But after the Court applied the doctrine to non-UCC cases, *see Redarowitz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982) (purchaser of a home could not sue the builder in tort for economic losses resulting from defects in the home's construction); *accord Morrow v. L.A. Goldschmidt Associates, Inc.*, 112 Ill. 2d 87, 96 Ill.Dec. 939, 492 N.E.2d 181 (1986), a number of Illinois appellate courts read *Moorman* broadly as barring all tort claims for economic loss except those specifically excepted in *Moorman*. Since claims against professionals usually seek only economic loss—rarely does professional misconduct cause personal injury or property damage—these courts have barred most actions against professionals for negligent performance of their services. *See, e.g., People ex rel. Skinner v. Graham*, 170 Ill.App.3d 417, 120 Ill.Dec. 612, 524 N.E.2d 642 (4th Dist.1988); *Bates & Rogers Construction Corp. v. North Shore Sanitary District*, 128 Ill.App.3d 962, 84 Ill.Dec. 149, 471 N.E.2d 915 (2d Dist.1984), *aff'd on other grounds*, 109 Ill.2d 225, 93 Ill.Dec. 369, 486 N.E.2d 902 (1985).

This view of the economic loss doctrine derives from the Illinois Supreme Court's failure to tie its doctrine into the traditional elements of tort liability. To recover in tort, a plaintiff always has had to establish three things: duty; breach of duty; and damages. W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser on Torts* § 30, at 164–65 (5th ed. 1984). Most courts, including the United States Supreme Court, have prohibited claims for economic loss on the ground that a manufacturer has no extra-contractual duty to prevent economic loss. *See East River Steamship Corp. v. Transamerica Delavel, Inc.*, 476 U.S. 858, 871, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865 (1986). Had the Illinois Supreme Court framed the doctrine as such, it would have made clear that where the law imposes extra-contractual duties, a breach of those duties can give to liability in tort even if the only losses are purely economic ones.

The Illinois Court, however, has not explained its doctrine in this way. Instead, it has suggested the prohibition on economic loss arises not because the defendant had no tort duty to avoid such loss, but simply because contract, rather than tort, provides a more appropriate framework for dealing with economic loss. This approach takes tort and contract as mutually exclusive, *see* Bertschy, The Economic Loss Doctrine in Illinois After *Moorman*, 71 Ill.B.J. 346, 351 (1983)—ignoring the fact that in some circumstances an individual's duties extend beyond the contours of his contractual relationship—and would bar most professional negligence claims. *See Anderson Electric Company, Inc. v. Ledbetter Erection Corporation*, 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986) (Simon, J., specially concurring) (criticizing majority's exclusive focus on the nature of the loss).

Of course, if the Illinois Supreme Court truly meant to preempt all tort claims for economic loss—except in the two classes of cases set forth in *Moorman*—then federal courts have no authority to overrule this approach in diversity cases. But the Court never actually has ruled that the doctrine extends to cases in which the defendant has extra-contractual duties, *see Bates & Rogers Construction Corp. v. Greeley & Hansen*, 109 Ill.2d 225, 229, 93 Ill.Dec. 369, 486 N.E.2d 902 (1985) (declining to decide

whether doctrine barred negligence claim against professional architect); *Ferentchak v. Village of Frankfort*, 105 Ill.2d 474, 479, 86 Ill.Dec. 443, 475 N.E.2d 822 (1985) (same for civil engineer), and two factors indicate that it did not intend for the doctrine to go that far.

First, the view that the two exceptions set forth in *Moorman*—i.e., claims of intentional misrepresentation, and of negligent misrepresentation by those in the business of supplying information—are the exclusive exceptions to the doctrine provides no rationale for why they should be so. Any justification for these exceptions—for example, that even a manufacturer has a duty to avoid intentionally misrepresenting his product—implies that the exceptions are merely illustrative of a broader set of cases in which applying the doctrine would be inappropriate. *See, e.g., Waldinger Corp. v. CRS Group Engineers, Inc.*, 775 F.2d 781 (7th Cir.1985) (*Moorman* does not bar claims for intentional interference with contractual relationship); *accord Santucci v. Baxter and Woodman*, 151 Ill.App.3d 547, 553, 104 Ill.Dec. 474, 502 N.E.2d 1134 (1984).

Second, and more important, to hold that *Moorman* bars tort claims for economic loss even where the defendant has extra-contractual duties "would, simply by inference, effectively eliminate and stand squarely in conflict with the body of law defining the scope" of professional liability. *Rosos Litho Supply Corporation v. Hansen*, 123 Ill.App.3d 290, 295, 78 Ill.Dec. 447, 462 N.E.2d 566 (1st Dist.1984). A number of Illinois and federal courts have declined to read *Moorman* that broadly for precisely this reason, *see id.; People ex rel. Skinner v. FGM, Inc.*, 166 Ill.App.3d 802, 177 Ill.Dec. 673, 520 N.E.2d 1024 (5th Dist. 1988); *Kishwaukee Community Health Services Center v. Hospital Building and Equipment Co.*, 638 F.Supp. 1492 (N.D.Ill. 1986), and at least one Illinois Supreme Court case lends support to this view.

In *Pelham v. Griesheimer*, 92 Ill.2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96 (1982), a case decided just a few months after *Moorman*, the Court made no mention of the economic loss doctrine in ruling that, under certain circumstances, a non-client could sue an attorney for negligence. *See also Ogle v. Fuiten*, 112 Ill.App.3d 1048, 68 Ill.Dec. 491, 445 N.E.2d 1344 (4th Dist.1983). Since the damages in such a case would almost always constitute economic loss, this ruling strongly suggests that the Court did not even consider that the economic loss doctrine would serve as a bar to professional negligence claims. *See Dundee Cement Co. v. Chemical Laboratories, Inc.*, 712 F.2d 1166 (7th Cir.1983).

Limited to their holdings, the Illinois Supreme Court's economic loss doctrine cases provide a coherent philosophical and practical statement regarding the duties of manufacturers and other providers of tangible products: Whereas they have a societal obligation to prevent physical injury and damage to other property, and a duty as well to refrain from intentional misrepresentations, their obligations with respect to their products are primarily contractual. *Cf. Pippin v. Chicago Housing Authority*, 78 Ill.2d 204, 209, 35 Ill.Dec. 530, 399 N.E.2d 596 (1979) (scope of duty in voluntary undertaking is limited by contractual relationship). To extend the doctrine to claims of professional negligence, however, deprives the doctrine of its coherence. Why a professional who violates his extra-contractual obligations should gain immunity from liability merely because the damage he causes is economic finds no explanation in the cases and stands at odds with long-established law. *See* Hnatt, Purely Economic Loss: A Standard for Recovery, 73 Iowa L.Rev. 1181, 1198 (1988). Absent a clear message from the Illinois Supreme Court, this court can find no basis for extending the doctrine this far. Because Dean Witter implicitly has conceded that it is a provider of professional services, *cf. Rankow v. First Chicago Corp.*, 870 F.2d at 364–65, it cannot escape liability on the basis alone that Harrison's losses were purely economic.

#### b. Duty

Dean Witter next argues that it is entitled to summary judgment because it had no duty to prevent harm—economic or oth-

erwise—to Harrison. Harrison has responded with evidence that Dean Witter knew or should have known that Kenning and Carpenter were investing out of Carpenter's personal account more money than the two could afford. In light of Kenning's prior problems at Prudential–Bache, this evidence creates a genuine factual dispute as to whether Dean Witter likewise should have been alerted to the possibility that Kenning and Carpenter wrongfully were obtaining funds from outside sources. Yet, even if Dean Witter knew that Kenning and Carpenter were committing fraud, this knowledge alone is not enough to subject it to liability; Dean Witter must have had a duty to intervene on Harrison's behalf. *Homer v. Pabst Brewing Co.*, 806 F.2d 119, 121 (7th Cir.1987); *see generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser on Torts* § 53 (5th ed. 1984). Whether Dean Witter had such a duty is an issue of law. *Ferentchak v. Village of Frankfort*, 105 Ill.2d 474, 480, 86 Ill.Dec. 443, 475 N.E.2d 822 (1985).

Although the foreseeability of injury is an important consideration in determining whether one has a duty to act reasonably with respect to another, it is not alone. *Kirk v. Michael Rees Hospital & Medical Center*, 117 Ill.2d 507, 111 Ill.Dec. 944, 513 N.E.2d 387 (1987). Instead, four factors come into play: "(1) whether the occurrence or accident was foreseeable; (2) the likelihood of injury; (3) the magnitude of the burden of guarding against that injury from occurring; and (4) the consequence of placing that burden upon the defendant." *Salvi v. Montgomery Ward & Co.*, 140 Ill.App.3d 896, 95 Ill.Dec. 173, 489 N.E.2d 394 (1986); *Barnes v. Washington*, 56 Ill. 2d 22, 29, 305 N.E.2d 535 (1973). In cases where it is alleged that one person failed to prevent a third person from doing harm to another, the last two factors usually take precedence over the first two. That is, while wrongdoing may be forseeable, and injury likely, the law generally imposes no duty to prevent such harm because the burden on the defendant of imposing such a duty outweighs the benefits of doing so. *See Heldt v. Brei*, 118 Ill.App.3d 798, 802, 74 Ill.Dec. 413, 455 N.E.2d 842 (1983); Restatement (Second) of Torts, § 314; W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser on Torts* § 56, at 376 (5th ed. 1984).

Every rule has exceptions; this rule has two. A person who knows or has reason to know that a third person may cause harm to another has an obligation to protect the other if (1) the person has a special relation with the third person or (2) the person has a special relation with the other. *See* Restatement (Second) of Torts § 315; *generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser on Torts* § 56, at 383–85 (5th ed. 1984). In the employer-employee context, both exceptions may come into play: An employer may have a duty to prevent employee wrongdoing because of the employer's relationship with the employee, and it may have a duty to prevent such wrongdoing because of its relationship with certain members of the public— i.e., its customers.

Harrison fails to specify the basis for his allegation that Dean Witter had a duty to prevent Kenning and Carpenter from injuring him. Instead, he argues that Dean Witter had a broad duty to prevent any employee from harming any member of the public. This is not so. *See Capalbo v. Paine Webber, Inc.*, 672 F.Supp. 1048, 1054 (N.D.Ill.1987).

The employee-employer relationship imposes a duty on an employer to prevent employee misconduct when the employee is located on employer's premises or using the employer's property in furtherance of the wrong. *See* Restatement (Second) of Torts § 317; *Gregor v. Keliser*, 111 Ill. App.3d 333, 67 Ill.Dec. 38, 443 N.E.2d 1162 (1983). The mere fact that an employer has knowledge of an employee's delinquent tendencies, however, does not impose a duty on the employer to fire or otherwise sanction the employee so long as the employee does his thing outside the employer's premises and without the aid of the employer's property. *See* Restatement (Second) of Torts § 317, Comment b; *Roberson v. Allied Foundry and Machinery Co.*, 447 So.2d 720 (Ala.1984); *cf. Insurance Co. of North America v. Hewitt-Rob-*

**1436**

*bins, Inc.,* 13 Ill.App.3d 534, 301 N.E.2d 78 (1973).

■ Kenning and Carpenter committed their fraud without the use of Dean Witter property. They did not give Harrison a Dean Witter contract, did not provide him with Dean Witter receipts, and did not pay him with Dean Witter checks. Nor did the two commit the fraud on Dean Witter's premises: Although they conversed with Harrison over the phone from Dean Witter's offices, the fraud occurred when Harrison either mailed checks to their homes or wired money to their personal accounts. Dean Witter's relationship with the two therefore did not obligate it to discover and terminate their fraud on Harrison.

An employer also has a duty to prevent employee wrongdoing when the employer has a contractual relationship with a customer which facilitates the employee's wrong. *See generally* Restatement (Second) of Agency § 213. Thus, for example, if an employer contracts to provide moving services to a customer, it may be liable if an employee robs the customer during the move. *Becken v. Manpower, Inc.,* 532 F.2d 56 (7th Cir.1976). And if an employer undertakes to provide security services to a customer, the employer may be liable if its employees use the employer's special privileges to enter the premises as part of a burglary scheme. *International Distributing Corp. v. American Distributors,* 569 F.2d 136 (D.C.Cir.1977); *see also Welsh Manufacturing, Division of Textron, Inc. v. Pinkerton's Inc.,* 474 A.2d 436 (R.I. 1984).

■ Dean Witter and Harrison, however, had no relationship. To be sure, Harrison may have believed that he was a Dean Witter customer, but Dean Witter's duty to control the activities of its employees vis-a-vis its customers extends only so far as its contract with those customers. As already discussed, Dean Witter did not have a contractual relationship with Harrison. It therefore had no obligation to protect them from the wrongdoing of Dean Witter employees. Accordingly, Dean Witter is entitled to summary judgment on Harrison's negligence claim.

*Section 20(a)*

In addition to *respondeat superior* and common law negligence, Congress has provided an alternative basis for imposing liability on securities firms in § 10(b) claims. Section 20(a) of the Securities Exchange Act of 1934 provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

Liability under § 20(a) is both broader and narrower than liability under common law *respondeat superior.* The controlled person need not be an employee or agent of the defendant for the defendant to be subject to liability for wrongdoing, so long as the defendant exercised some control over the wrongdoer with respect to the wrongful acts. *Christoffel v. E.F. Hutton & Co., Inc.,* 588 F.2d 665, 668 (9th Cir.1978). On the other hand, § 20(a), unlike *respondeat superior,* allows the defendant to escape liability if it can show that it acted in good faith and did not induce the misconduct. *See generally* Notes, rule 10b–5—The Equivalent Scope of Liability Under Respondeat Superior and Section 20(a)—Imposing a Benefit Requirement on Apparent Authority, 35 Vand.L.Rev. 1383, 1400–04 (1982).

Before examining Dean Witter's potential liability under § 20(a), it is first necessary to identify the underlying violation, since without such a primary violation there can be no secondary liability, *Bosio v. Norbay Securities,* 599 F.Supp. 1563, 1570 (E.D.N.Y.1985), and since Dean Witter can be held liable only for the wrongful acts of Kenning and Carpenter over which it exercised control, *Sennott v. Rodman & Renshaw,* 474 F.2d 32, 39–40 (7th Cir.1973).

Dean Witter begins by arguing that there was no § 10(b) violation at all. Under § 10(b), fraud is actionable only if it is "in connection with the purchase or sale of [a] security." 15 U.S.C. § 78j(b).[9] Dean Witter contends that the fraud here was not in connection with the purchase of municipal bonds because Kenning and Carpenter never actually purchased the bonds. This case, Dean Witter says, involves a conversion of funds, nothing more, and conversion does not give rise to a § 10(b) claim, *see Crummere v. Smith, Barney, Harris, Upham & Co., Inc.*, 624 F.Supp. 751, 755 (S.D.N.Y.1985); *Smith v. Chicago Corp.*, 566 F.Supp. 66 (N.D.Ill.1983).

Harrison does not take issue with Dean Witter's argument on this score.[10] Instead, Harrison argues that the securities here were the promissory notes Kenning and Carpenter gave to Harrison when he provided them with funds to purchase municipal bonds. Dean Witter, though noting that Harrison's position marks a sharp shift from his earlier argument that the notes were nothing more than receipts, concedes that these notes are securities for § 10(b) purchases.

Harrison's victory, however, is short-lived. Having established that Kenning and Carpenter committed fraud in connection with their sales of these notes, he now must show that Dean Witter exercised control over the two brokers with respect to these sales. This he cannot do.

Although *respondeat superior* and § 20(a) are not coextensive, so that an employee may act outside the scope of his employment and yet still be a controlled person under § 20(a), courts have agreed that employment alone does not bring every one of an employee's acts within the coverage of the statute. *See Carpenter v. Harris, Upham & Co.*, 594 F.2d 388 (4th Cir.1979); *Christoffel v. E.F. Hutton & Co., Inc.*, 588 F.2d 665 (3d Cir.1978); *cf. Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986). Section 20(a) requires, at least, that the firm have the ability directly or indirectly to influence the employee's doing of the specific unlawful act—for example, to prohibit the act from taking place on the employer's property. Where the employee's wrongdoing involves acts unrelated to his employment, his employer cannot be held liable on the grounds alone that it could have fired him had it known of the wrongdoing. *Christoffel v. E.F. Hutton & Co., Inc.*, 588 F.2d 665, 669 (3d Cir.1978); *see also Bradshaw v. Van Houten*, 601 F.Supp. 983, 986–87 (D.Ariz.1985).

Dean Witter exercised no control over Kenning and Carpenter with respect to their sales of promissory notes. It did not know of these sales, nor could it have known of them, since Carpenter and Kenning structured their arrangement with Harrison to ensure that Harrison would not send any money to them at the office. Further, the sales were conducted in the names of Kenning and Carpenter alone; the payments on the notes were by Carpenter's personal checks; and Harrison never contacted Dean Witter to inquire about his investments.

■ Dean Witter had an obligation to supervise Kenning and Carpenter at the office. It had obligations to ensure that Dean Witter's customers were not being defrauded by the two brokers, and to investigate any signs of wrongdoing with regard to the brokers' job-related activities. But those obligations did not extend to the bro-

---

**9.** Section 10 provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange—
    *      *      *      *      *      *
(b) To use or employ, in connection with the purchase and sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contraven-

tion of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b).

**10.** Because of Harrison's implied concession, this court need not and does not decide whether Dean Witter is correct in arguing that Kenning and Carpenter did not violate § 10(b) by investing in options rather than in municipal bonds.

kers' personal affairs. Harrison could have brought himself within the protections of § 20(a) by insisting on receipts and statements bearing Dean Witter's name. Instead, he chose to enter into transactions which any reasonable person, indeed any rational person, would have to conclude were personal transactions between himself and Kenning and Carpenter. Dean Witter's responsibilities under § 20(a) simply did not reach that far. The firm is therefore entitled to summary judgment on Harrison's § 20(a) claim.

### CONCLUSION

Dean Witter's motion for summary judgment is granted on each count in the complaint. Judgment is entered for Dean Witter.