37 F.3d 1493
 RICO Bus.Disp.Guide 8662
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Mark E. HARRAH; Irma Marker; Gary Mitchell, Plaintiffs-Appellants,
v.
J. C. BRADFORD & COMPANY, INCORPORATED; Robert Archie
Clemmons, Defendants-Appellees.
 No. 93-2458.
 United States Court of Appeals, Fourth Circuit.
 Argued: May 11, 1994.
Decided: Oct. 6, 1994.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Frank W. Bullock, Jr., Chief District Judge. (CA-91-33-2, CA-92-123-6, CA-92-189-2)
 ARGUED: J. Matthew Martin, Martin & Martin, P.A., Hillsborough, NC; Kenneth Winchester Gaines, Columbia, SC, for Appellants.
 James Donald Cowan, Jr., ON BRIEF: Leigh F. Moran, Smith, Helms, Mulliss & Moore, L.L.P., Greensboro, NC, for Appellees.
 M.D.N.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and ELLIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 In this appeal, we consider whether a brokerage firm is liable for the actions of an individual who, while not employed by the brokerage firm, traded through the firm as part of an overall scheme to defraud a number of investors. Specifically, Robert A. Clemmons, Jr., ("Clemmons") told a number of individuals, including appellants, that he would invest their money in stock options guaranteed to generate large returns with no risk of loss. In reality, this was a scheme to defraud these individuals, a scheme for which Clemmons was convicted of five counts of obtaining property by false pretenses, in violation of N.C. Gen.Stat. Sec. 14-100.[1] Appellants sued appellee J.C. Bradford & Company ("Bradford"), the brokerage firm through which Clemmons traded, contending that Bradford knew of, was involved with, and furthered Clemmons' fraudulent scheme in violation of the North Carolina Investment Adviser's Act, the North Carolina Unfair and Deceptive Trade Practices Act, and the Racketeer Influenced and Corrupt Practices Act ("RICO"), 18 U.S.C.Sec. 1961 et seq. The district court, finding no evidence that Bradford knew about the scheme, entered summary judgment for Bradford on all claims. We affirm.
 
 I.
 
 2
 Clemmons first met appellant Harrah in the fall of 1987. At this meeting, Clemmons represented that he was an experienced options trader and that if Harrah entrusted money to him for investment in stock options, Harrah would be guaranteed to make profits. Harrah took the bait, and during the period from January through September 1988 gave Clemmons over $124,000.
 
 
 3
 This was just the beginning. In 1988, Clemmons approached appellant Mitchell, owner of a supermarket across from Bradford's offices. Clemmons represented to Mitchell that he was a licensed stockbroker, urged Mitchell to entrust him with money for investment, and told Mitchell, as he had told Harrah, that Mitchell was guaranteed to make money. Mitchell, too, took the bait and ultimately gave Clemmons over $60,000 for investment purposes.
 
 
 4
 Clemmons, the holder of Bradford trading accounts since 1986, was not a Bradford employee. There is no dispute, however, that Clemmons often visited the Bradford offices and received phone calls there.[2] While the record does not disclose exactly what Clemmons did with the money entrusted to him,[3] it does appear that Clemmons used his Bradford accounts to invest substantial sums of money. On several occasions Clemmons showed appellants Bradford confirmation slips for transactions purportedly made with the funds entrusted to him. Significantly, none of these slips bore appellants' names. Nor did appellants themselves ever receive confirmation slips, account statements, or any other information or communications directly from Bradford.
 
 
 5
 Clemmons lost heavily on his investments. On several occasions in 1987 and 1988, Bradford broker Larry Pulliam, who had assisted Clemmons in opening his second Bradford option account, suggested that Clemmons open additional Bradford option accounts to cover his increasing losses. Acting on this suggestion, Clemmons eventually opened additional options accounts, but his losses continued to mount. There is no evidence that Pulliam knew the source of Clemmons' investment funds.
 
 
 6
 In the fall of 1988, appellants Harrah and Mitchell told Clemmons they wanted their money back. At about this time, Clemmons met appellant Marker and used the same fraudulent scheme on her that he had used on Harrah and Mitchell. Thus, he informed her that he was a self-employed stockbroker with offices at Bradford, and that if she entrusted money to him to invest in options, she would make substantial profits with no risk of loss. The two exchanged numbers, and several weeks later Clemmons called Marker and told her it was a good time to buy RJR-Nabisco options. Subsequently, Clemmons met Marker in a service station parking lot and showed her Bradford confirmation slips indicating trades in RJR-Nabisco options. Marker was hooked; she ultimately gave Clemmons $43,132 to invest.
 
 
 7
 In January 1989, in an effort to cover his losses and continue trading, Clemmons opened yet another Bradford option account. In opening this account Clemmons falsified certain information regarding his assets and income. Appellants contend that Bradford broker Pulliam failed to verify Clemmons' claimed income and assets. While the record reflects that Pulliam made some preliminary efforts to verify Clemmons' claimed assets and income, Bradford concedes that Pulliam did not require a bank reference from Clemmons[4] and ultimately failed to verify Clemmons' projected income with Clemmons' attorney and purported business partner.[5] By early 1989, all three appellants demanded the return of their original investments plus any profits earned. While it appears that Clemmons made small, partial reimbursements to Harrah and Mitchell, he never fully repaid appellants. Mitchell, not satisfied with this partial reimbursement, demanded the return of all of his money by March 4, 1989. When this did not occur, Mitchell went to Bradford's offices and informed branch manager Dave Kinne that Clemmons had been trading with his money. While the parties dispute Kinne's motivation, it is not disputed that Kinne, after learning from Mitchell that Clemmons was trading with Mitchell's money, immediately closed Clemmons' accounts.
 
 
 8
 In July 1989 the Greensboro, North Carolina Police Department's Fraud Division commenced an investigation of Clemmons that later also involved the Securities Division of the North Carolina Secretary of State's Office. As a result of this investigation, Clemmons was arrested, indicted and, in August 1991, convicted of five counts of obtaining property by false pretenses.
 
 
 9
 Each of the appellants filed individual suits against Bradford.[6] These actions were consolidated in July, 1992. Bradford moved for summary judgment on all claims, and the district court granted Bradford's motion in October, 1993. This appeal followed.
 
 II.
 
 10
 The district court's entry of summary judgment is reviewed de novo. Drewitt v. Pratt, 999 F.2d 774, 778 (4th Cir.1993). In assessing the factual record, we must grant the nonmoving party the benefit of inferences, as "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Id., citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Yet, while the underlying facts and all inferences are viewed in a light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979), the non-moving party must nonetheless offer some "concrete evidence from which a reasonable [finder of fact] could return a verdict in its favor" or other "significant probative evidence tending to support the complaint." Liberty Lobby, 477 U.S. at 256. It is through the lens of these principles that we examine the district court's grant of summary judgment.
 
 III.
 
 11
 We first consider appellants' claims under section 78C-8 of the North Carolina Investment Advisers Act. That Act provides:
 
 
 12
 (a) It is unlawful for any person who receives directly or indirectly, any consideration from another person for advising the other person as to the value of securities ... (1)[t]o employ any device, scheme, or artifice to defraud the other person, (2)[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the other person....
 
 
 13
 N.C. Gen.Stat. Sec. 78C-8(a)(1)-(2) (1990). The Act further prohibits any person, acting as principal for his own account, from:
 
 
 14
 knowingly ... [selling] any security to ... or acting as broker for a person other than such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.
 
 
 15
 N.C. Gen.Stat. Sec. 78C-8(a)(3). Appellants contend that Bradford violated Sec. 78C-8 by participating in Clemmons' fraudulent scheme.
 
 
 16
 The record, in our view, forecloses this contention. Bradford's conduct simply does not fall within the terms of Sec. 78C. While Clemmons clearly engaged in a fraudulent scheme, there is insufficient record evidence to allow a trier of fact to conclude that Bradford employed any "device, scheme, or artifice to defraud" appellants or engaged in any act, practice, or course of business which operated as a fraud on appellants. Further, there was neither evidence, nor were there any allegations, that any Bradford employee ever gave appellants advice regarding the value of securities. Significantly, appellants acknowledge that they were aware that Clemmons was not a Bradford employee. And finally, there is no indication that Bradford ever had any relationship with appellants requiring written disclosures regarding how appellants' funds were being invested. While appellants may have a claim against Clemmons under N.C. Gen.Stat.Sec. 78C,[7] they do not have such a claim against Bradford.[8]
 
 IV.
 
 17
 Likewise, appellants have no claim against Bradford under the North Carolina Unfair and Deceptive Trade Practices Act, which provides that a practice is unfair if it is unethical or unscrupulous, or is deceptive and has a tendency to deceive. N.C. Gen Stat. Sec. 75-1.1; see Polo Fashions Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir.1987). Appellants correctly concede that "ordinarily N.C. Gen.Stat. Sec. 75-1.1 does not apply to securities transactions," as there is "pervasive and intricate" securities regulation under both the North Carolina Securities Act as well as the Securities Exchange Act of 1934. Skinner v. E.F. Hutton & Co., 333 S.E.2d 236, 241 (N.C.1985); see Lindner v. Durham Hosiery Mills, Inc., 761 F.2d 162, 167 (4th Cir.1985). Yet appellants contend they may nonetheless sue Bradford under Sec. 75-1.1 because the case involves "much more" than mere securities fraud.
 
 
 18
 We find this argument unpersuasive;[9] it is flatly contradicted by the record, which unmistakably shows that appellants' claims against Bradford involve securities-related activities. Specifically, appellants' complaints, and supporting memoranda in the case, assert that Bradford's role in Clemmons' fraudulent scheme involved permitting Clemmons to open new option accounts without an adequate financial basis, assisting Clemmons in filling out false option trading account forms, assisting Clemmons in his fraudulent investment activities and permitting Clemmons to use Bradford facilities to conduct his trading activities. These are plainly securities-related activities, and appellants' contention that such securities-related activities were a mere "backdrop" to Clemmons' larger scheme does not change this result. As appellants' allegations against Bradford are premised on securities-based wrongdoings, the district court did not err in holding that appellants' claims under the North Carolina Unfair and Deceptive Practices Act were barred.
 
 V.
 
 19
 Finally, appellants contend that the district court erred in dismissing their RICO claim against Bradford. To state a claim under RICO appellants must show (1) that the defendant/appellee (2) through the commission of two or more acts (3) constituting a "pattern" (4) of racketeering activity (5) directly or indirectly invests in (6) an enterprise (7) the activities of which affect interstate or foreign commerce. See 18 U.S.C. Sec. 1961 et seq.; see also United States v. Griffin, 660 F.2d 996, 999 (4th Cir.1981), cert. denied sub nom. Garonzik v. United States, 454 U.S. 1156 (1982).
 
 
 20
 Given these requirements, RICO may well reach Clemmons' actions. Yet, only through the doctrine of respondeat superior can RICO reach any alleged actions by Bradford. This is a novel issue in this circuit, as we have never directly ruled on the existence of a cause of action under RICO premised on respondeat superior.[10] As it happens, we need not decide this question today, for even if this circuit were to recognize a cause of action under RICO based on respondeat superior, there is insufficient evidence in this record to warrant a trier of fact finding that Bradford, or its brokers/agents were part of Clemmons' scheme and as such engaged in a course of conduct that violated RICO.
 
 
 21
 Seeking to avoid this result, appellants rely heavily on Harrison v. Dean Witter Reynolds, Inc., 715 F.Supp. 1425 (N.D. Ill.1989), aff'd in part and rev'd in part on other grounds, 974 F.2d 873 (7th Cir.1992), cert. denied, 113 S.Ct. 2994 (1993), which held that a brokerage/employer may be liable for the fraudulent acts of its brokers/employees if the employees had either actual or apparent authority for their actions. The instant case, appellants argue, falls squarely within Harrison because: (1) Pulliam was Clemmons' broker at Bradford; (2) Pulliam made investment recommendations to Clemmons; (3) all of Clemmons' transactions were apparently made through appellee; (4) Bradford's employees took phone calls for Clemmons at Bradford offices; (5) Clemmons was seen by Mitchell at Bradford's offices;[11] and (6) receipts shown by Clemmons to appellants bore Bradford letterhead.
 
 
 22
 Appellants' argument is unpersuasive; the enumerated facts are not sufficient, individually or collectively, to allow a trier of fact to conclude that Kinne or Pulliam were part of, or knew about, Clemmons' fraudulent scheme, or that Kinne and Pulliam or any other Bradford employee committed any acts that violate RICO. And the enumerated facts clearly do not show that there existed the type of "continuity, unity, shared purpose and identifiable structure" to find respondeat superior liability as to Bradford based on the acts of its brokers/agents. See Griffin, 660 F.2d at 1000. The fact that Pulliam, as Clemmons' broker, gave Clemmons investment advice and assisted him in opening options accounts is not sufficient to compel the conclusion that Pulliam participated in Clemmons' fraudulent scheme, and is, a fortiori, not sufficient to impute respondeat superior liability to Bradford. While it is true that Clemmons apparently traded through Bradford, there is no evidence that Bradford was aware that Clemmons' transactions were made with money fraudulently obtained from other investors. Rather, it is undisputed that once Bradford's branch manager was informed that Clemmons was investing the money of others, he immediately closed Clemmons' Bradford accounts.[12] Next, as appellants' own expert conceded, Clemmons' frequent presence at Bradford warrants no inference that he was Bradford's agent, or that Bradford knew anything about his scheme or the source of his investment funds. Nor is there the slightest evidence that Bradford knew Clemmons may have paid a Bradford receptionist to take phone calls for him.[13] Moreover, appellants' expert correctly acknowledged that the fact Clemmons made a number of calls from Bradford's offices would not, in itself, suggest to Bradford that Clemmons was involved in fraudulent activity. And, while Clemmons may have shown Bradford confirmation slips to appellants, these slips did not have appellants' names on them and the record indicates that appellants never received any information or communications from Bradford. Further, appellants have produced no evidence indicating that Kinne, Pulliam, or any other Bradford employee either knew about, authorized, or participated in giving Clemmons the Bradford confirmation slips. Finally, Clemmons was not an agent, but merely a customer, of Bradford's, and there is no evidence that Kinne, Pulliam, or any other Bradford agent either held themselves out to appellants, the injured parties, as representing Clemmons, or gave investment advice directly to appellants. As appellants have failed to show that Bradford either knew about or participated in Clemmons' fraudulent scheme, or that Bradford's agents knew about or participated in Clemmons' scheme such that liability can be imputed to Bradford under the doctrine of respondeat superior, the district court did not err in granting summary judgment to Bradford on appellants' RICO claim.
 
 
 23
 Accordingly, for the reasons stated, the judgment of the district court is
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 Clemmons was initially convicted of an additional eighteen counts of transacting business in securities without being licensed or registered with the North Carolina Secretary of State, in violation of the North Carolina Securities Act. The North Carolina Court of Appeals vacated Clemmons' convictions on these counts after concluding that Clemmons did not "transact business" in securities within the meaning of the Act. State v. Clemmons, 433 S.E.2d 748, 750-52 (N.C.App.), cert. denied, 439 S.E.2d 153 (N.C.1993)
 
 
 [2]
 Unbeknownst to either Bradford or appellants, Clemmons apparently paid a Bradford receptionist $100 to answer his calls and take messages
 
 
 [3]
 Clemmons used the same scheme to defraud a number of other investors besides appellants
 
 
 [4]
 Bradford contends that a bank reference was not necessary, as Clemmons was purportedly trading on a cash-only basis
 
 
 [5]
 Apparently, Pulliam contacted Clemmons' business partner, who refused to provide the requested information and who later informed Clemmons that Pulliam had called. Clemmons expressed displeasure over what he regarded as a unwarranted intrusion into his private affairs, and Pulliam did not make a second attempt to get the financial information
 
 
 [6]
 Because Clemmons declared bankruptcy, the resulting automatic stay effectively precluded appellants from suing Clemmons
 
 
 [7]
 In reviewing Clemmons' conviction, the North Carolina Court of Appeals indicated that the State had leave to file additional charges against Clemmons pursuant to Sec. 78C. State v. Clemmons, 433 S.E.2d 748, 752-53 (N.C.App.), cert. denied, 439 S.E.2d 153 (N.C.1993)
 
 
 [8]
 Alternatively, the Sec. 78C claims of appellants Harrah and Mitchell may be precluded because their claims arose before the Act's effective date of January 1, 1989. Because there is no conspiracy allegation with respect to appellants' Sec. 78C claims, claims under this statute arose when appellant gave money to, or received investment advice from, Clemmons. Both Harrah and Mitchell last gave money to or received investment advice from Clemmons in late 1988, prior toSec. 78C's effective date. Given this, the Sec. 78C claims of Harrah and Mitchell would likely fail, as "[i]t is a well-established principal [sic]" of North Carolina law "that a statute is presumed to have prospective effect only and should not be construed to have a retroactive application unless such an intent is clearly expressed or arises by necessary implication from the terms of the legislation." Wilson Ford Tractor, Inc., v. Massey-Ferguson, Inc., 414 S.E.2d 43, 45 (N.C.App.), aff'd without opinion, 422 S.E.2d 576 (N.C.1992). And where, as here, no such express legislative intent exists, "every reasonable doubt should be resolved against a retroactive operation of a statute." Id. at 45 (quoting Hicks v. Kearney, 127 S.E. 205, 207 (N.C.1925)). Marker may escape this result, as the record indicates that she last gave money to Clemmons in early 1989. In any event, we need not reach this issue to resolve the Sec. 78C claims
 Likewise, we need not reach Bradford's contention that Mitchell's and Marker's claims are time-barred under the applicable statute of limitations, which requires a claimant to file his or herSec. 78C claim within three years after investment advice was last rendered, or within two years after an individual discovers, or should have discovered, the facts constituting a violation. N.C. Gen Stat. Sec. 78C-38(d).
 
 
 [9]
 Equally unpersuasive is appellants' claim that their position on Sec. 75-1.1 is supported by the fact that Clemmons' convictions for securities fraud under N.C. Gen.Stat. Sec. 78A were overturned, with the North Carolina Court of Appeals holding that Clemmons did not "transact" business within the meaning of the North Carolina Securities Act. State v. Clemmons, 433 S.E.2d at 752. That ruling is of no help to appellants as it focused on the actions of Clemmons, not Bradford
 
 
 [10]
 A number of circuits have held that a cause of action based on respondeat superior exists under RICO if a distinction can be made between the company as an "enterprise" and as a "corporate person." See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386 (11th Cir.1994) (union could face respondeat superior liability for RICO violations by union negotiators who illegally arranged to receive pension benefits when such actions were taken by negotiators in their capacities as union representatives); Davis v. Mutual Life Ins. Co. of New York, 6 F.3d 367 (6th Cir.1993) (insurance company may face RICO liability, based on respondeat superior, for its participation in an agent's fraudulent scheme); see also Brady v. Dairy Fresh Products Co., 974 F.2d 1149 (9th Cir.1992) (corporate entities that derive benefit from representative's wrongful acts may face respondeat superior liability under RICO); Landry v. Air Line Pilots Ass'n Int'l, 901 F.2d 404 (5th Cir.1990), cert. denied, 498 U.S. 895 (1990) (same)
 Other courts recognize more limited RICO causes of action premised on respondeat superior. See, e.g., Schofield v. First Commodity Corp., 793 F.2d 28 (1st Cir.1986) (there is no respondeat superior under Sec. 1962(c) of RICO); SK Hand Tool Corporation v. Dresser Industries, 852 F.2d 936, 941 (7th Cir.1988), cert. denied, 492 U.S. 918 (1989) (corporate defendant was not vicariously liable under RICO for acts of certain individual defendants when it was an "unwilling conduit"). Finally, several district courts in this circuit have indicated that RICO claims may be premised on respondeat superior. See Mylan Lab. Inc. v. Akzo, N.V., 770 F.Supp. 1053 (D. Md.1991), dismissed, 808 F.Supp. 446 (D. Md.1992); later proceeding 2 F.3d 86 (4th Cir.1993), rev'd, 7F.3d 1130 (4th Cir.1993), cert. denied sub. nom American Home Products Corp. v. Mylan Labs., 114 S.Ct. 1307 (1994) (respondeat superior was appropriate basis for holding corporation vicariously liable for RICO violations of its employees); Tryco Trucking Co. v. Belk Stores Services, Inc., 634 F.Supp. 1327 (W.D.N.C.1986) ("RICO envisions respondeat superior liability").
 
 
 [11]
 Appellants argue that Clemmons' frequent visits to Bradford's offices distinguishes the case from at least one aspect of Harrison, where the court indicated that there was no agency relationship between Dean Witter and its agent/brokers in part because the brokers' fraudulent activities took place primarily outside of Dean Witter's offices. Harrison, 715 F.Supp. at 1431. Appellants' argument is unconvincing, for all of the direct transactions between Clemmons and appellants, in particular the transfer of funds, took place outside of Bradford's offices
 
 
 [12]
 Appellants mistakenly assert that Davis v. Mutual Life Ins. Co. of New York, 6 F.3d 366 (6th Cir.1993), supports their claim that Bradford must be deemed an active participant in Clemmons' scheme because Bradford made substantial sums of money from Clemmons' trading activities. Instead, Davis indicates that a corporation must sponsor or promote the fraudulent scheme, or at least be aware of it, in order to face RICO liability. See Davis, 6 F.3d at 379-80 (refusing to invalidate jury's determination that corporation faced RICO liability for the acts of its agents where there was evidence that the company "actively promoted and sponsored the scheme," and benefitted from scheme through resulting increase in its corporate income). No such evidence is in this record
 
 
 [13]
 In her deposition the receptionist did not confirm that Clemmons paid her to take his messages at Bradford. Rather, she indicated that she took messages for Clemmons as a "common courtesy" to a Bradford client, and further indicated that she had taken messages for other customers, as well