Barbara MARSTON, Appellant (81–447),

and

Nancy E. Williams, Appellant (81–469),

v.

MINNEAPOLIS CLINIC OF PSYCHIA-
TRY AND NEUROLOGY, LTD., et
al., Respondents.

Nos. 81–447, 81–469.

Supreme Court of Minnesota.

Dec. 23, 1982.

As Modified on Denial of Rehearing
Feb. 3, 1983.

Dayton, Herman, Graham & Getts and Philip W. Getts, Minneapolis, for Marston.

Gilmore, deLambert, Aafedt, Eustis & Forde, Warren P. Eustis, and Janet Monson, Minneapolis, for Williams.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, J. Richard Bland and Robert E. Salmon, Minneapolis, for respondents.

YETKA, Justice.

Both cases, brought against the same defendants, were tried separately in Hennepin County District Court. Case No. 81–447 (Marston) is an appeal from judgment filed on March 11, 1981, and an order dated April 3, 1981, denying plaintiff's and defendant Nuernberger's motions for judgment NOV or, in the alternative, a new trial. Plaintiff, Barbara Marston, brought this suit against defendants, Dr. E. Philip Nuernberger (Dr. Nuernberger) and Minneapolis Clinic of Psychiatry and Neurology (Minneapolis Clinic), for damages resulting from sexual acts committed during plaintiff's therapy sessions with defendant Nuernberger. The jury returned a special verdict, finding that the sexual conduct occurred outside the scope of employment, but that defendant Nuernberger was liable for $15,000 actual and $50,000 punitive damages. Plaintiff moved for judgment NOV on the issue of whether defendant Minneapolis Clinic was liable under respondeat superior; defendant Nuernberger, for judgment NOV on the issue of whether the award of $50,000 punitive damages was excessive. From the denial of these motions, the parties appeal.

Case No. 81–469 (Williams) is an appeal from the trial court's denial of plaintiff's motion for a new trial dated April 15, 1981. In this case, tried separately, the jury found that the plaintiff suffered damages as a result of the sexual acts committed by defendant Dr. Nuernberger, but that the defendant Minneapolis Clinic was not liable either under respondeat superior or directly for negligence in supervising Dr. Nuernberger. Plaintiff appeals from the order denying a new trial on the issue of liability under respondeat superior against the Minneapolis Clinic.

We reverse and remand for a new trial in each of these cases.

The facts in these consolidated cases are largely undisputed for the purposes of this

appeal. In the Marston case, plaintiff Barbara Marston was referred to defendant Minneapolis Clinic for "biofeedback" therapy of chronic headaches and back pains. A friend suggested that she contact defendant Dr. Nuernberger, who, at all times relevant, was a licensed psychologist employed by the Minneapolis Clinic. Marston made an appointment to see Dr. Nuernberger for treatment. The first two sessions were routine and involved relaxation exercises and therapy on the biofeedback machine—a device that registers and measures the degree of muscular tension. On the third session, Dr. Nuernberger had Marston lie down on a sofa and instructed her to begin a relaxation exercise. Dr. Nuernberger later gave Marston a facial massage. He then reached over, put his arms around Marston and kissed her. Marston testified that, because of the trust she had placed in Dr. Nuernberger, she became quite upset and confused. She wrote a letter to Dr. Nuernberger explaining her feelings. Dr. Nuernberger persuaded her to continue treatment, however, and Marston scheduled a fourth session.

At the fourth session, as Marston was leaving, Dr. Nuernberger pulled her onto his lap, kissed her and commented: "There, that's not so bad, is it?" Marston, however, did not end her therapy relationship with Dr. Nuernberger and continued to make appointments. After the next session had ended, Dr. Nuernberger gave Marston a neck and shoulder massage, unbuttoned her blouse and engaged in petting. Eight more sessions followed, with heavy petting, kissing and sexual encounters occurring after the end of therapy. No sexual intercourse took place, however. Marston became increasingly depressed and finally terminated the therapy sessions. In March 1977, Marston called Dr. Maland Hurr, a neurologist at the clinic, and related the actions of Dr. Nuernberger.

In the Williams case, plaintiff Nancy Williams was referred by another physician to the Minneapolis Clinic for biofeedback therapy to relieve severe chronic migraine headaches. Williams' first sessions with Dr. Nuernberger were uneventful. Eventually,

the pattern changed. After approximately 45 minutes of therapy on the biofeedback machine, consultation and relaxation exercises, Dr. Nuernberger would begin a neck and back massage to help relieve tension. Dr. Nuernberger would then move Williams to a different room, have her lie down on a couch, and begin to caress and kiss her. This pattern continued from February to May. Sexual intercourse never occurred, although at one point Dr. Nuernberger suggested that Williams move out of her parents' home and get an apartment for the purpose of conducting nude body massages. Dr. Nuernberger never suggested that the sexual encounters had any therapeutic effect. He told Williams that she was his favorite patient, that he would see her regardless of her ability to pay for the therapy, and that she should not see any other psychologists. Williams further testified that the therapeutic value of her regular treatment suffered when she requested Dr. Nuernberger to cease his sexual advances and that she did not leave him because she was confused and desperate for help. Apparently Williams was severely depressed and seriously chemically dependent during this period.

Finally, in June 1977, Williams told Dr. Nuernberger that his sexual advances had to cease. Williams did not inform the Minneapolis Clinic of Dr. Nuernberger's actions.

At both trials, various experts testified as to the impropriety and seriousness of Dr. Nuernberger's actions. Dr. Nuernberger testified that facial and back massages are an accepted technique of biofeedback therapy and are generally used at the Minneapolis Clinic. Witnesses for the clinic, however, testified that any sexual contact or relationship with a patient is absolutely forbidden. Further, experts testified that sexual contact is so aberrant that effective therapy ceases. In addition, there was uncontradicted testimony that any sexual contact or relationship with a patient is totally unethical, of no therapeutic purpose, purely personal and strictly proscribed by the Code of Ethics of the American Psychological Association. One witness testified that the

problem of a dual relationship between a doctor and patient is considered to be a well-recognized hazard.

In both cases, plaintiffs' requested jury instructions on scope of employment were denied. Instead, the trial court instructed the jury pursuant to JIG II 252. Both juries returned verdicts finding that Dr. Nuernberger violated his profession's standards of care. None of the parties contests these findings. The juries also found that Dr. Nuernberger acted outside the scope of his authority. In addition, in Williams, the jury absolved the Minneapolis Clinic of any separate negligence in its duty towards the plaintiff. The parties appeal only on the issue of respondeat superior and the amount of punitive damages awarded.

The issues raised on appeal are:

 I. Did the trial court err by instructing the jury under JIG II 252 on the issue of respondeat superior?

 II. Were the acts of Dr. Nuernberger outside his scope of employment as a matter of law?

 III. Was the award of $50,000 punitive damages excessive in the Marston case?

Appellants' Marston and Williams major argument concerns the correctness of the trial court's jury instructions and the validity of JIG II 252 on the issue of scope of employment. The trial court instructed the jury pursuant to JIG II 252 as follows:

> An agent is acting within the scope of his employment when he is performing services for which he has been employed or while he is doing anything which is reasonably incidental to his employment. The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the principal but rather whether such conduct should have fairly been foreseen from the nature of the employment and the duties relating to it *and was brought about, at least in part, by a desire by the agent to serve the principal.*

(Emphasis added.) Appellant Marston, however, proposed that the test is whether "the conduct occurs during the time of employment and at a place of employment." Appellant Williams requested that the court instruct the jury that the employer is liable when the employee is "doing anything which is reasonably incidental to his employment, and * * * within work related limits of time and place." Both instructions were refused.[1]

Appellants challenge the use of JIG II 252, arguing that it does not correctly state the rule enunciated in *Lange v. National Biscuit Company,* 297 Minn. 399, 211 N.W.2d 783 (1973) (hereinafter *Lange*). Appellant's argument is that *Lange* overruled prior cases requiring that the employee be "motivated by a desire to further the employer's business." *Id.* at 401, 211 N.W.2d at 784. Respondent, Minneapolis Clinic, however, contends that the appellants have misinterpreted *Lange* and emphasizes this court's recent decision in *Edgewater Motels, Inc. v. Gatzke,* 277 N.W.2d 11 (Minn.1979).

Prior to *Lange,* the rule in Minnesota imposed liability only where it was "shown that the employee's acts were motivated by a desire to further the employer's business." 297 Minn. at 401, 211 N.W.2d at 784. *Lange* concerned a cookie salesman employed to sell cookies to grocery stores in a particular territory. At one store, an argument developed as to the amount of shelf space allotted for defendant's cookies. The cookie salesman threatened and then assaulted the store owner. After noting the prior rule and discussing the policy basis for a liberal rule of liability under respondeat superior, this court stated:

> [W]e believe that the focus should be on the basis of the assault rather than the motivation of the employee. We reject as the basis for imposing liability the arbitrary determination of when, and at what point, the argument and assault leave the sphere of the employer's busi-

---

1. It should be noted initially that the proposed instructions, regardless of the validity of JIG II 252, do not correctly and completely reflect the rule established in *Lange v. National Biscuit Co.,* 297 Minn. 399, 211 N.W.2d 783 (1973), as discussed below.

ness and become motivated by personal animosity. Rather, we believe the better approach is to view both the argument and assault as an indistinguishable event for purposes of vicarious liability.

*Id.* at 403–04, 211 N.W.2d at 785. This court then adopted the rule that "an employer is liable for an assault by his employee when the source of the attack is related to the duties of the employee and * * * occurs within work related limits of time and place," noted that the motivation test was "abandoned" and held that all prior decisions, to the extent they were inconsistent, were overruled. *Id.* at 405, 211 N.W.2d at 786.

Minneapolis Clinic argues that the exact scope of the rule enunciated in *Lange* has been rendered unclear by this court's recent holding in *Edgewater Motels, Inc. v. Gatzke,* 277 N.W.2d 11 (1979). In that case, this court held that there was sufficient evidence to support a jury verdict that an employee was acting within the scope of employment when he *negligently* caused a fire at the plaintiff's hotel. The court noted, citing *Lange,* that in order to establish that an employee is acting within the scope of employment, "it must be shown that his conduct was, to some degree, in furtherance of the interests of his employer." *Id.* at 15. This court also quoted, with approval, the Restatement (Second) of Agency § 235 (1958) and further stated that among the factors to be considered was whether the act was "motivated in part to further the interests of the employer." [2] 277 N.W.2d at 17 n. 6.

 We see no conflict between *Lange* and *Gatzke. Lange* deals with an intentional tort while *Gatzke* deals with a case of negligence. For an intentional tort, the focus is on whether the assault arises out of a dispute occurring within the scope of employment. It is irrelevant whether the actual assault involves a motivation to serve the master. On the other hand, when the

claim lies in negligence, the relevant duty of care is determined by employment status. Consequently, the requirement that the employee act, at least in part, in furtherance of his employer's interest requires both the existence of the duty and its exercise. Some confusion evidenced by this appeal stems from the statement by this court in *Lange* that "the employee originally was motivated to become argumentative *in furtherance of his employer's business.*" 297 Minn. at 404, 211 N.W.2d at 786 (emphasis added). This statement, however, was intended merely to indicate that, even under the motivation test, the original precipitating event for the assault in *Lange* occurred in the scope of employment. It was not intended to preserve the motivation test for intentional torts.

In the present case, the employee's sexual overtures to his patients cannot really be characterized as assaults, certainly not in the same way that the cookie salesman in *Lange* physically attacked the store owner nor the way the deliveryman sexually assaulted plaintiff in *Lyon v. Carey,* 533 F.2d 649 (D.C.Cir.1976). Dr. Nuernberger's advances may have been unwelcome, but they were not unconsented to and there is no evidence the doctor persisted in his conduct over any explicit objections or resistance. Neither, on the other hand, was Dr. Nuernberger's conduct simply negligence, as was the case of the employee in *Gatzke.*

Dr. Nuernberger, however, did act intentionally. In his relations with his patients, he intentionally departed from the standards of his profession, not, it is true, to cause harm to the two patients, but rather to confer a personal benefit· on himself. This does not appear to be simply a case of a mutual infatuation; rather, it seems to be one where it is shown that the doctor imposes his personal, improper designs on the patient in a professional setting and—as some of the evidence suggests—the patient submits to the advances because of the very

**2.** Restatement (Second) of Agency § 235 (1958) provides: "An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." The comments stress that intent is the most important factor here.

mental and emotional problems for which she is being professionally treated, thereby exacerbating these problems. In such a case, a jury might find that the employee's conduct is so related to the employment that the employer may be vicariously liable. To require that the employee who intentionally acts in his own personal interests in this factual setting must also have the intention to be acting in furtherance of his employer's interests unfairly distorts, as *Lange* would put it, the focus on how the employment relates to the incident.

■ We conclude, therefore, that the *Lange* rule should apply here and that the employee's motivation should not be a consideration for imposition of vicarious liability. One basic rationale underlying *Lange* is that it would be a rare situation where a wrongful act would actually further an employer's business. In addition, it is both unrealistic and artificial to determine "at which point the [acts] leave the sphere of the employer's business and become motivated by personal animosity"—or, as in this case, an improper, personal benefit. 297 Minn. at 403, 211 N.W.2d at 785.

We hold, therefore, that it was reversible error, in giving JIG II 252 to the jury, to include the phrase "and was brought about, at least in part, by a desire by the agent to serve the principal." We think, consistent with the *Lange* rationale, that JIG II 252 may be used in cases where the employee's or agent's conduct involves an intentional wrong if mention is made that the conduct must occur within work-related limits of time and place and if the offending phrase above quoted is deleted.[3]

■ It should also be noted that appellants' argument that this court should determine that the acts are within the scope of employment as matter of law is without merit. Nor, as respondent argues, are Dr.

Nuernberger's acts necessarily outside the scope of employment. Rather, this presents a question of fact requiring a remand on this issue. There was testimony that sexual relations between a psychologist and a patient is a well-known hazard and thus, to a degree, foreseeable and a risk of employment. In addition, the instant situation would not have occurred but for Dr. Nuernberger's employment; it was only through his relation to plaintiffs as a therapist that Dr. Nuernberger was able to commit the acts in question. *See generally Carr v. Wm. C. Crowell Co.,* 28 Cal.2d 652, 171 P.2d 5 (1946) (work-related assault); *Pritchard v. Gilbert,* 107 Cal.App.2d 1, 236 P.2d 412 (1951) (work-related assault). Moreover, the acts occurred during or shortly after regular therapy sessions and were preceded by normal massages. It is noteworthy that other courts have not found sexual assaults to be necessarily outside the scope of employment. Rather, they also are treated as presenting a question of fact to be determined on a case-by-case basis. *E.g., Lyon v. Carey,* 533 F.2d 649 (D.C.Cir.1976). Thus, it should be a question of fact whether the acts of Dr. Nuernberger were foreseeable, related to and connected with acts otherwise within the scope of employment. *Todd v. Forest City Enterprises,* 300 Minn. 532, 219 N.W.2d 639 (1974).

■ Dr. Nuernberger argues that the award of punitive damages of $50,000 was excessive, contrary to law, the product of passion and prejudice, and requests a remittitur to a lesser amount or a new trial on this issue only. Dr. Nuernberger's basic argument, that the trial court abused its broad discretion to set aside an excessive jury verdict, refers only to general principles. He also claims that there was no evidence of malice. Both contentions are without merit.

---

**3.** We note that JIG II 252 was drafted prior to our *Lange* decision. In the case of an intentional wrong, then, the JIG instruction might be modified to read: "An agent is acting within the scope of his employment when he is performing services for which he has been employed or while he is doing anything which is reasonably incidental to his employment. The conduct must occur within work-related limits of time and place. The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the principal but rather whether such conduct should fairly have been foreseen from the nature of the employment and the duties relating to it."

The general rule is that "[w]hether punitive * * * damages are appropriate * * * is within the discretion of the jury. [Citation omitted] The weight and force to be given evidence relating to punitive damages is exclusively a jury question" and "[i]n determining whether punitive damages are unreasonably excessive, the court should consider, among other factors, the degree of malice, intent or willful disregard, the type of interest invaded, the amount needed to truly deter such conduct in the future * *." *Wilson v. City of Eagan,* 297 N.W.2d 146, 150–51 (Minn.1980); *see* Minn.Stat. § 549.-20, subd. 3 (1980).

In this regard, the trial court did not abuse its discretion in refusing to reduce the award of punitive damages. Upon review of the transcript, there is no indication that the punitive damages were the result of passion or prejudice; there was no prejudicial testimony and no comments which would have acted to inflate the size of the award. Further, there was sufficient evidence of malice to justify the award of punitive damages. Although Dr. Nuernberger denied that he committed the acts complained of, his testimony establishes that he was well aware that the rules of his profession and the canon of ethics unequivocally proscribe sexual activity with patients. This also tends to establish the magnitude of Dr. Nuernberger's transgressions. Thus, the award of punitive damages against Dr. Nuernberger was not excessive and will not be disturbed.

■ Reversed and remanded for new trials consistent with this opinion. In the *Marston* case, the new trial shall be restricted to liability; there need not be a retrial on damages. In *Williams,* there must be a retrial on all issues. In neither case is there any evidence that would justify an award of punitive damages against the clinic directly. We do not, however, express an opinion on whether punitive damages against the employer are appropriate under a respondeat superior theory, this issue not having been presented on appeal.

COYNE, J., took no part in the consideration or decision of this case.

TODD, Justice (concurring specially).

I concur in the majority opinion but would change the *Lange* standards as applied to professional associations. Once the time and place standards of *Lange* are met, I would then hold that in the case of professional associations a different standard should be applied in determining scope of employment and in allocating the burden of proof. I would instruct the jury that because of the personal and confidential relationship that exists between the members or employees of the association and the patient or client of the professional association, any transgressions are the responsibility of the association. Any violation of the ethics of the particular profession should be the responsibility of the entity offering the services. A person seeking the services of the professional association should not be denied recovery for injuries caused by transgressions that occur at the professional office on the grounds that the particular act of the individual member or employee violates the code of ethics of the particular profession. The patient or client has no responsibility to regulate the ethical conduct of the person rendering services. Also, in many cases, the very nature of the services being rendered diminish the capacity of the patient or client to protect themselves from the transgressions as they may occur.

On remand I would direct the trial court to instruct the jury in accordance with the standards set forth herein.

PETERSON, Justice (dissenting).

I acknowledge that our decision in *Lange v. National Biscuit Company,* 297 Minn. 399, 211 N.W.2d 783 (1973), substantially diminishes the motivation test for determining whether an intentional tort is committed within the scope of the tortfeasor's employment, although our later decision in *Edgewater Motels, Inc. v. Gatzke,* 277 N.W.2d 11 (Minn.1979), indicates it was not wholly discarded. Whether or not JIG II 252 is an accurate statement of our law, I dissent because Dr. E. Phillip Nuernberger's con-

duct was clearly outside the scope of his employment as a matter of law, and thus any error in instructing the jury was without prejudice. The test enunciated in *Lange* does not compel, and policy considerations urge against, the extension of vicarious liability to the employer in the cases now before us.

The motivation test was challenged in *Lange* because it imposed liability on an employer according to an arbitrary determination of an employee's state of mind at the precise moment the tort occurs. 297 Minn. at 403, 211 N.W.2d at 785. The *Lange* test, as applied to an argument that escalates into an assault, shifts the focus backward in time to the precipitating cause of the initial dispute. 297 Minn. at 403–04, 211 N.W.2d at 785. The argument and assault are treated as an indistinguishable event for purposes of vicarious liability.

Thus, in *Lange*, we observed that the initial dispute arose out of the employee's employment-related efforts to secure shelf space for his product. Since the ensuing assault took its "color and quality from the earlier act" it was held within the scope of employment as a matter of law. 297 Minn. at 404, 211 N.W.2d at 786 (quoting *Gulf, C. & S.F. Ry. Co. v. Cobb*, 45 S.W.2d 323, 326 (Tex.Civ.App.1931)). In the cases before us, the sexual acts of Dr. Nuernberger are not themselves within the scope of his duties as a therapist and cannot under any view of the facts be traced to precipitating acts from which they can draw an employment-related "color and quality."

The majority notes that the sexual acts were preceded by normal massages. There is no evidence, however, that the therapeutic massages administered by Dr. Nuernberger caused or were the source of the sexual contact. These cases should not turn on the fortuitous fact that massages were given in the course of treatment. I would not view these cases differently if the unethical sexual conduct of the therapist was preceded solely by counseling without physical contact.

The only case cited by the majority for the proposition that sexual acts may be found to be within the scope of employment does not sustain the decision to remand. In *Lyon v. Carey*, 533 F.2d 649 (D.C.Cir.1976), a violent sexual assault arose out of an argument between the plaintiff and a deliveryman over the delivery of merchandise in the course of the employer's business. The court limited its holding by noting that if "the [sexual] assault was not motivated or triggered off by anything in the employment activity but was the result of only propinquity and lust, there should be no liability [on the employer]." *Id.* at 655. Similarly, under the *Lange* rule, the employer should not be liable when the source of Dr. Nuernberger's tortious acts lay not in his duties as an employee but in his aberrant desire for his patients.

Having concluded that the result reached by the majority is contrary to precedent, I object to the apparently inadvertent expansion of the vicarious liability doctrine. Commentators have struggled without success to arrive at a single, self-sufficient reason for holding an employer vicariously liable,[1] so it is necessary to measure the majority's holding against several commonly advanced rationales.

Under one rationale, vicarious liability is imposed on an employer because of the "control" or right of "control" by the employer over the physical conduct of his employee. This consideration justifies vicarious liability "only if control is interpreted as the ability of the principal to monitor the precautionary behavior of the agent."[2] Vicarious liability, when triggered by activities such as those surrounding the tort in *Lange*, creates incentives for an employer to monitor an employee's behavior and perhaps adjust the standards by which job

---

1. See, *e.g.*, W. Prosser, The Law of Torts 459 (4th ed. 1971); Brill, *The Liability of an Employer for the Wilful Torts of His Servants*, 45 Chi.-Kent L.Rev. 1, 2–3 (1968).

2. Note, *An Efficiency Analysis of Vicarious Liability Under the Law of Agency*, 91 Yale L.J. 168, 191 (1981).

performance is judged.[3] The defendant clinic, however, is unable effectively to monitor a patient-therapist relationship without breaching the confidentiality of the relationship.

A second justification argues that since the employer reaps a benefit when the employee acts properly, the employer should share the cost when he acts improperly. If the salesman in *Lange* had succeeded through aggressive behavior in swaying the store manager, the immediate beneficiary would have been his employer. The benefit theory justified vicarious liability in that case. The logical limit to vicarious liability under the benefit theory must be at those cases involving activities that could never result in a benefit to the employer. Dr. Nuernberger's conduct falls outside of this rationale.

Perhaps the predominant modern justification for vicarious liability is a conscious rule of public policy forcing businesses to treat liability for the acts of employees as a cost of doing business, which cost is then spread to the community at large. In *Lange* we called this the "entrepreneur theory." 297 Minn. at 403, 211 N.W.2d at 785. This justification appeals to an instinctive sense of justice, especially in regard to those negligent torts that will occur even with reasonable precautions. But there may be a social cost to the spreading of risks. Where the employee alone is in a position to monitor his behavior, vicarious liability "tends to increase the number of torts, perhaps to the detriment of efficiency, by diluting the [employee's] incentives for precautionary behavior."[4]

For the foregoing reasons, I disagree that these facts warrant a broader "scope of employment" rule. Nor should we adopt at this time a special rule by which professional associations are vicariously liable for the actions of their members or employees whenever the time and place standards are met. The far-reaching ramifications of such a rule have received no consideration by the parties or the court below. The cases were tried solely on the theory of a simple employer-employee relationship, and both plaintiffs argued before this court under the *Lange* rule.

KELLEY, Justice (dissenting).

I join in the dissent of Justice Peterson.

---

3. The control theory was mentioned as a "secondary consideration" in *Lange,* 297 Minn. at 403, 211 N.W.2d at 785.

4. Note, *supra* note 2, at 197. The dilution of incentives is evident in one of the present consolidated cases, where plaintiff Williams proceeded against employer without joining Dr. Nuernberger as defendant.