**Joseph SEMRAD, et al., Appellants,**

v.

**EDINA REALTY, INC., et al.,
Respondents.**

**No. C4-90-1976.**

Court of Appeals of Minnesota.

May 14, 1991.

Review Granted Aug. 2, 1991.

---

Jan Stuurmans, Stuurmans & Karan, P.A., Minneapolis, for appellants.

George F. McGunnigle, Jr., Nancy Wiltgen Reibert, Leonard, Street and Deinard, Minneapolis, for respondents.

Donald D. Smith, Thomsen & Nybeck, P.A., Edina, for amicus Minnesota Ass'n of Realtors.

Considered and decided by LANSING, P.J., and HUSPENI and DAVIES, JJ.

## OPINION

HUSPENI, Judge.

Glen Marsh, a real estate salesperson working for respondent Edina Realty, Inc., sold appellants contract equity funding notes (CEFNs) and other investments

which later became worthless. Appellants sued respondent Edina Realty, Inc. and its president and vice-president, respondents Roger Rovick and David Rovick, for fraud, negligence, breach of fiduciary duty, deceptive trade practices and sales of unregistered securities, all based on respondents' liability for Marsh's conduct. Appellants also sued respondents for violation of their duties under the Real Estate Brokers Act, Minn.Stat. §§ 82.17–.34 (1982), and for negligent supervision. Following a trial without a jury, the court found respondents liable only to appellant Dorothy Halla–Poe for breach of fiduciary duty in the amount of $23,625.92 plus prejudgment interest. The court found for respondents on all other counts.

## FACTS

Glen Marsh, a sales associate with Edina Realty from 1972 until 1987, met appellants Virginia and Joseph Semrad in 1970. The Semrads later purchased and sold real property through Edina Realty and Marsh. Less than a year after that sale, Marsh persuaded the Semrads to invest in contracts for deed. Edina Realty authorized its sales associates to sell contracts for deed under limited circumstances.[1]

Through Marsh, the Semrads purchased several contracts for deed and subsequently invested in mortgage notes, a limited partnership, and CEFNs. Marsh explained to the Semrads, as he explained to other appellants, that the funds invested in CEFNs were pooled and used to purchase many contracts for deed on a variety of properties. He represented to them that this made CEFNs safer than contracts for deed, and that CEFNs alleviate paperwork and provide higher interest rates. Marsh formed several business entities, including Glen Marsh Real Estate Investments, and several different Five Points groups, through which he conducted his securities activities and his private real estate ventures. All of the CEFNs he sold to appellants stated on their face that they were issued by "Five Points Financial Group," a division of either "Glen Marsh Real Estate Investments" or "Glen Marsh Real Estate Investments Corporation."

Appellant Rose Sherman, the Semrads' daughter, purchased a home through Marsh and Edina Realty in 1980. In 1983, at her mother's suggestion, Sherman purchased a $5,000 CEFN from Marsh. The Semrads gave a CEFN to another daughter, appellant Mary Romanski, as a gift.

When appellant Dorothy Strudwick's aunt died in 1976, Strudwick contacted Marsh at Edina Realty about selling her aunt's home. After the home sold, Strudwick decided to buy a home. Marsh persuaded her to make a small downpayment and invest the remainder in contracts for deed. In 1976 and 1977, Strudwick invested in four contracts for deed and loaned $35,000 to Marsh's investment company, Five Points Limited, at Marsh's suggestion. In April 1983, Marsh visited Strudwick and exchanged her contracts for deed for CEFNs, saying "this is paid up." Strudwick purchased two additional CEFNs for $40,000.

Strudwick's daughter, appellant Dorothy Halla–Poe, wanted to purchase a condominium. On her mother's advice, she contacted Marsh at Edina Realty. Following Marsh's advice, Halla–Poe put a minimum amount down on the condominium and invested a substantial amount in CEFNs. Appellant Joann Hanson–Sanford, who learned about Marsh and his investment companies from her friend Strudwick, also invested in a CEFN.

1. When a home buyer is unable to obtain adequate bank or other institutional financing, the seller may agree to loan the buyer a portion of the purchase price under a contract for deed, which generally requires the buyer to make monthly payments of interest and principal, with the balance and the greatest part of the principal coming due on a "balloon" date. If the seller prefers an immediate cash payment rather than receipt of future payments under the contract for deed, the sales associate helps the seller find an investor willing to purchase the contract for deed, generally at a substantial discount from the face value of the contract. The home seller then has no further interest in the home; the purchaser of the contract for deed has effectively loaned money to the home buyer in exchange for the future payments stated in the contract, and the loan is secured by the home.

Appellant Mary Deems contacted Marsh at Edina Realty when she decided to sell her home and buy a condominium. She put a small amount down on the condominium and invested in contracts for deed on Marsh's advice. Marsh replaced the contracts for deed with CEFNs, "rolling over" the debt prior to the balloon dates. Mary Deems also invested in mortgage notes and further CEFNs. Marsh later persuaded Mary Deems' husband, appellant James Deems, to invest in a CEFN.

Appellant Robert Wilcox, who heard about Marsh from a friend who sold a home through Marsh, invested in a CEFN after contacting Odd Rovick, a former officer of Edina Realty, to discuss the investments Marsh offered.

Appellants received all payments due on all contracts for deed, mortgage notes and CEFNs until December 1986. At that time all of the contracts for deed had been paid off or rolled over into CEFNs, and are not directly the subjects of this suit. Marsh sent each appellant a letter in December 1986 informing them that his companies were in default. Within the month he sent each appellant a final payment of a marginal portion of the outstanding debt. This lawsuit followed.

During the pendency of this appeal, appellants sought leave of this court to file an expanded brief. That motion was denied after briefing. Respondents brought a motion to strike appellants' brief on the grounds that appellants had circumvented the page limitation through excessive use of footnotes. Respondents' motion was referred for consideration together with all issues on the merits.

## ISSUES

1. Are respondents liable for Marsh's transactions as "controlling persons" within the meaning of Minn.Stat. § 80A.23, subd. 3?

    a. Does fraud toll the three-year limitations period of Minn.Stat. § 80A.23, subd. 7?

    b. Did the trial court apply the proper test for determining whether respondents are "controlling persons"?

    c. Did the trial court apply the test properly?

2. Is there a private cause of action for violation of the Real Estate Brokers Act, Minn.Stat. §§ 82.17–.34?

3. Did the trial court err in holding that respondents were not liable on a theory of respondeat superior?

    a. Could the evidence support a finding that respondents actually authorized Marsh's sales of investments?

    b. Does the evidence support the trial court's finding that respondents did not apparently authorize Marsh's sales of investments?

4. Did the trial court err in holding that respondents were not liable to appellants for negligent supervision?

    a. Did the trial court err in holding that respondents were not liable under Restatement (Second) of Agency § 213?

    b. Does the evidence support the trial court's finding that respondents are not liable under the standard stated in Restatement (Second) of Torts § 317?

5. Should this court order sanctions due to appellants' alleged attempt to circumvent the 50–page limit for appellate briefs?

## ANALYSIS

This appeal involves issues of law, issues of fact, and mixed questions of fact and law. The findings of a trial court sitting without a jury are entitled to the same weight as a jury verdict. *Duluth Herald & News Tribune v. Plymouth Optical Co.*, 286 Minn. 495, 497, 176 N.W.2d 552, 555 (1970). This court will not set aside such findings unless they are manifestly contrary to the evidence or based on an erroneous view of the law. *State Farm Mut. Auto. Ins. Co. v. Levinson*, 438 N.W.2d 110, 112 (Minn.App.1989). This court, however, need not defer to the trial court's determination of questions of law. *Kadlec Motors, Inc. v. Knudson*, 383 N.W.2d 342, 345 (Minn.App.1986).

### I.

In their complaint, served July 23, 1987, appellants charged respondents with sell-

ing unregistered securities in violation of Minn.Stat. §§ 80A.01 and 80A.23, subd. 2 (1984) based on their liability as persons who controlled Marsh within the meaning of Minn.Stat. § 80A.23, subd. 3 (1984). The trial court concluded that the statute of limitations barred claims based on investments made before July 23, 1984, and that respondents were not controlling persons for any of the subsequent transactions. Appellants challenge both of these conclusions.

a. *Statute of Limitations*

■■■ Minn.Stat. § 80.26 (1971), the precursor to Minn.Stat. § 80A.23, subd. 7 provided:

No action shall be maintained for relief upon a sale of securities made in violation of any of the provisions of sections 80.05 to 80.27 * * * unless commenced within three years after the date on which the securities were delivered to the purchaser pursuant to such sale.

The Minnesota Supreme Court found that fraud did not toll the limitations period stated in section 80.26 because the provision "expressly exclude[d] the fraudulent concealment exception usually applied" by failing to include a provision for accrual of the cause of action on discovery of the fraud. *Kopperud v. Agers*, 312 N.W.2d 443, 447 (Minn.1981).

In 1973, the legislature adopted the Minnesota version of the Uniform Securities Act, Minn.Stat. §§ 80A.01–.31. The new act replaced chapter 80 of Minnesota statutes. The present applicable statute provides in part:

No person may commence an action under subdivision 2 more than three years after the occurrence of the act or transaction constituting the violation.

Minn.Stat. § 80A.23, subd. 7.

Appellants ask this court to interpret section 80A.23, subd. 7 according to federal standards, which generally require application of the equitable doctrine of tolling to federal statutes of limitation. *Holmberg v. Ambrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). We do not believe it would be appropriate to apply federal

standards to this Minnesota statute. Minn. Stat. § 80A.31 provides:

[This act] shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation of [this act] with the related federal regulation.

Most states which have enacted versions of the Uniform Securities Act have not allowed equitable tolling of the limitations period for fraud. *See Martin v. Pacific Ins. Co. of New York*, 245 Ark. 122, 125, 431 S.W.2d 239, 240 (1968); *City of Owensboro v. First U.S. Corp.*, 534 S.W.2d 789, 790–91 (Ky.1975); *Rzepka v. Farm Estates, Inc.*, 83 Mich.App. 702, 711, 269 N.W.2d 270, 274–75 (1978); *but see McIntyre v. ILB Inv. Corp.*, 172 N.J.Super. 415, 421, 412 A.2d 810, 814 (1979). Even the federal courts have refused to apply standards for federal statutes to the interpretation of section 80A.23. In *Hayden v. McDonald*, 742 F.2d 423, 437 (8th Cir.1984), *overruled on other grounds Austin v. Loftsgaarden*, 768 F.2d 949, 953 n. 6 (8th Cir.1985), *rev'd* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986), the court held that the reasoning of *Kopperud* applies to section 80A.23, subd. 7 with the same force as it had for interpretation of section 80.26 (1971). We agree. As the court stated in *TCF Banking and Savings, F.A. v. Arthur Young & Co.*, 706 F.Supp. 1408, 1415 (D.Minn.1988):

[T]he inescapable fact is that the statutory language is unambiguous and therefore must be presumed to reflect the intent of the Minnesota legislature.

We conclude that fraud does not toll the limitations period for claims under section 80A.23 and therefore the trial court properly held that claims relating to sales made before July 23, 1984 were barred.

b. *Which Test Applies?*

■■■ Applying the test for controlling person liability stated in *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985), *cert. denied Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986),

the trial court held that, for transactions after July 23, 1984, respondents did not qualify as controlling persons within the meaning of Minn.Stat. § 80A.23, subd. 3.

Appellants ask this court to reject the *Metge* test and remand to the trial court for the application of a test based on either *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574–76 (9th Cir.1990) (en banc), *cert. denied* —— U.S.· ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 or *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967), *cert. denied* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). Although *Metge, Hollinger* and *Myzel* all interpret federal securities law, they guide us in this case because federal precedent is especially valuable for deciding issues arising under chapter 80A. *Opatz v. John G. Kinnard & Co.*, 454 N.W.2d 471, 474 (Minn.App.1990).

Appellants first ask this court to adopt the rationale of *Hollinger*, 914 F.2d at 1564, and announce a per se rule that a broker always controls its representatives. We decline to announce such a rule. Even though the *Hollinger* court held that "a broker-dealer is a controlling person under § 20(a) with respect to its registered representatives," *id.* at 1574, it went on to explain:

> The broker-dealer may also, of course, rely on a contention that the representative was acting outside of the broker-dealer's statutory "control." For example, [defendant] could argue that when appellants entrusted their money to [violator] they were not reasonably relying upon him as a registered representative of [defendant], but were placing the money with [violator] for purposes other than investment in markets to which [violator] had access only by reason of his relationship with broker-dealer [defendant].

*Id.* at 1575–76 n. 26.

Respondents here are not securities broker-dealers. *See* Minn.Stat. § 80A.14, subd. 4. Therefore, *Hollinger* does not directly apply. Moreover, Marsh's registration with Edina Realty gave him license to work as an agent in the sale and purchase of real property, not to sell securities ostensibly backed by real properties. Un-

der the reasoning of *Hollinger*, respondents would not be liable as controlling persons for Marsh's violations of securities law.

Alternatively, appellants urge us to adopt the *Myzel* test. *Id.*, 386 F.2d at 738. In *Myzel*, the court held:

> The statute [regulating sale of securities] is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable.

*Id.* Federal courts however did not adopt the *Myzel* rationale as a test for controlling person liability. Instead, the circuits which cited *Myzel* developed two separate tests to determine who was a controlling person under federal securities law.

In *Rochez Bros. v. Rhoades*, 527 F.2d 880, 889–90 (3d Cir.1975), the third circuit determined that a defendant could not be liable as a controlling person unless the plaintiff showed defendant's culpable participation in the violation. *See Gordon v. Burr*, 506 F.2d 1080, 1085–86 (2d Cir.1974).

In *Metge*, the eighth circuit rejected the culpable participation test and, construing *Myzel*, formulated its own test for controlling person liability:

> [Plaintiff] must establish, first, that the defendant lender 'actually participated in (*i.e. exercised* control over) the operations of the [violator] in general; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this latter power was exercised.'

*Metge* at 631 (quoting *Metge v. Baehler*, 577 F.Supp. 810, 817–18 (S.D. Iowa 1984)) (emphasis in original).

Appellants argue that this court should fashion a test from *Myzel* to hold that a defendant controls a person whenever the defendant has some indirect means of disciplining or influencing that person. In light of established applicable federal standards, we decline the invitation to fashion a new test. Even the eighth circuit, the court which decided *Myzel*, adopted a different

test, announced in *Metge,* for determination of controlling person liability. We find the *Metge* test persuasive and hold that the trial court properly chose to apply that test.

### c. *Application of Metge*

■ Appellants contend that the trial court misapplied the *Metge* test, and its correct application would have resulted in a determination that respondents were liable. We cannot agree. While respondents actually participated in Marsh's sales of real estate, they did not participate in, or exercise control over, Marsh's securities operations. The trial court so found. The trial court also found that respondents "did not have the practical ability to direct the actions of Marsh" in his operation of Glen Marsh Real Estate Investments or any of the Five Points entities. The record amply supports the trial court's determinations.

Appellants argue that respondents controlled Marsh in that they had the power to terminate his real estate license and prevent him from using the Edina Realty office, telephone and address for his securities business. These facts, like the facts in *Metge,*

> suggest the *potential* for influence over some of [the violator's] business decisions, but they are not probative of appellants' allegation that [the defendant] actually exercised control over the operation of [the violator] in general. In fact, the evidence we have mentioned exemplifies the kind of evidence that might be adduced on the second prong of the test to demonstrate possession of power to control, rather than actual control.

*Id.,* 762 F.2d at 632 (emphasis in original); *see also Schlifke v. Seafirst Corp.,* 866 F.2d 935, 949–50 (7th Cir.1989) (ability to persuade is not the same as control).

The evidence supports the trial court's finding that respondents did not actually participate in, or exercise control over, Marsh's securities operations for any transactions occurring after July 23, 1984. Accordingly, we affirm the trial court's dismissal of appellants' claim that respondents violated Minnesota securities law based on their liability as controlling persons.

### II.

■ Appellants next allege that respondents violated the Real Estate Brokers Act, Minn.Stat. §§ 82.17–.34. The trial court held that there was no private cause of action available under the act. We agree.

Appellants' contention that the court in *Handy v. Garmaker,* 324 N.W.2d 168 (Minn.1982) established a private right of action under chapter 82 is without merit. In *Handy,* the employer failed to notify the Commissioner of Securities and Real Estate of the termination of an agent's employment in 1976, and signed a license renewal for that agent in 1977. *Id.,* 324 N.W.2d at 169. In 1977, the agent took an improper profit on a sale, and the injured client sued the employer as vicariously liable for common law breach of fiduciary duty. Although the agent was no longer an employee at the time of the breach, the court found the employer liable because he continued to hold himself out as the agent's employer. *Id.* at 173. Chapter 82 was cited as establishing the formal ways in which the agent remained an employee. *Id.* Since respondents in this case concede that they employed Marsh during the period in which he sold CEFNs, *Handy* has no bearing on the defenses respondents raise. The court in *Handy* did not decide whether a plaintiff could bring a private cause of action for violations of chapter 82, and appellants' reliance on that case is misplaced.

According to Minn.Stat. § 82.20, subd. 5:

> Each broker shall be responsible for the acts of any and all of [the broker's] sales people while acting [on the broker's behalf] as agents.

The act expressly grants enforcement powers to the Commissioner of Commerce and state prosecutors.

> The Commissioner may by order deny, suspend or revoke any license or may censure a licensee if he finds (1) that the order is in the public interest, and (2) that the * * * licensee:
>
> *       *       *       *       *       *

(b) Has engaged in a fraudulent, deceptive or dishonest practice;

* * * or

(e) Has violated or failed to comply with any provision of this chapter.

Minn.Stat. § 82.27, subd. 1(b) and (e). One who violates chapter 82 "shall be guilty of a gross misdemeanor." Minn.Stat. § 82.32. Chapter 82 does not contain any provision for enforcement of the act by anyone else.

By contrast, section 80A.23, subd. 1 provides:

Any person who sells a security in violation of sections 80A.08 or 80A.18 * * * is liable to the person purchasing the security from him, who may sue either in equity for rescission * * * or at law for damages.

The Minnesota legislature knew how to create a private right of action for violation of a regulatory statute; it chose not to do so in chapter 82. Accordingly, we affirm the trial court's dismissal of the claim for violations of the Real Estate Brokers Act.

### III.

Appellants sought recovery from respondents for fraud, breach of fiduciary duty, negligence, and deceptive practices in violation of the Consumer Fraud Act, Minn.Stat. §§ 325F.68–.70 (1984), all based on Marsh's actual and apparent authority at common law to act on behalf of respondents. Respondents concede that Edina Realty, as agent, gave Marsh actual authority, as its subagent, to sell contracts for deed in connection with Edina Realty real estate sales. Appellants contend that Edina Realty was the agent, and Marsh the subagent, for the sales of CEFNs and mortgage notes as well. The trial court found that Marsh had neither actual nor apparent authority for the transactions at issue in this case.

"Whether an agent was clothed with apparent authority to act as he did is a question for the trier of fact." *Hagedorn v. Aid Ass'n for Lutherans*, 297 Minn. 253, 257, 211 N.W.2d 154, 157 (1973). The question of whether an agent's acts fall within the scope of his actual authority is also a fact issue. *See Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn.1982) (as modified on denial of rehearing, Minn. Feb. 3, 1983).

#### a. *Actual Authority*

■ The trial court held that respondents were not liable for Marsh's sales of CEFNs and mortgage notes on the theory of actual authority because Marsh was not acting within the scope of his employment when he made the sales. Appellants contend that an act need not be for the benefit of the principal for it to be actually authorized. We agree. When a plaintiff seeks to hold an employer vicariously liable

[f]or an intentional tort, the focus is on whether the [tort] arises out of a dispute occurring within the scope of employment. It is irrelevant whether the actual [tort] involves a motivation to serve the master.

*Marston*, 329 N.W.2d at 310. Since Marsh's fraudulent sales of securities constitute an intentional tort, a motivation to serve respondents is irrelevant to respondents' liability.

Regarding liability for intentional torts in an analogous context, the supreme court suggested:

'An agent is acting within the scope of his employment when he is performing services for which he has been employed or while he is doing anything which is reasonably incidental to his employment. The conduct must occur within work-related limits of time and place. The test is not necessarily whether the specific conduct was expressly authorized or forbidden by the principal but rather whether such conduct should fairly have been foreseen from the nature of the employment and the duties relating to it.'

*Id.* at 311 n. 3 (citation omitted).

In *Marston*, Dr. Nuernberger, a psychologist employed by the defendant clinic, made sexual advances on the plaintiff during therapy sessions. The court rejected the clinic's contention that Nuernberger's acts necessarily fell outside the scope of his employment:

There was testimony that sexual relations between a psychologist and a pa-

tient is a well-known hazard and thus, to a degree, foreseeable and a risk of employment. \* \* \* Moreover, the acts occurred during or shortly after regular therapy sessions and were preceded by normal massages. \* \* \* Thus, it should be a question of fact whether the acts of Dr. Nuernberger were foreseeable, related to and connected with acts otherwise within the scope of employment.

*Id.* at 311.

In this case, the trial court found that "Glen Marsh was not selling investments on behalf of Edina Realty; Glen Marsh was in business for himself on the side" when he sold CEFNs and mortgage notes to appellants.

The legislature has distinguished the sale of securities, including Marsh's CEFNs and mortgage notes, from the sale of real estate by regulating those transactions in different chapters of Minnesota statutes. *Compare* Minn.Stat. ch. 80A (securities) with ch. 82 (real estate). As a real estate agency, Edina Realty did not have legal authority to sell securities. Minn.Stat. § 80A.04. Unlike *Marston,* where the therapy session in which the harm occurred was part of Dr. Nuernberger's work for the clinic, here, the sale of securities, even if it had not been harmful, was not a part of Marsh's work for Edina Realty. The evidence cannot support a finding that the sale of CEFNs, as well as the fraud in the sale of such investments, was "foreseeable, related to and connected with acts otherwise within the scope of employment." *Marston,* 329 N.W.2d at 311. The trial court was correct in determining that Glen Marsh had no actual authority from respondents to sell securities.

b. *Apparent Authority*

■ Appellants contend, alternatively, that respondents are liable for the fraudulent sales of CEFNs because they gave Marsh apparent authority to make the sales. The Minnesota Supreme Court has adopted the definition of apparent authority given in Restatement (Second) of Agency § 27 (1958):

[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

*Hagedorn,* 297 Minn. at 257–58, 211 N.W.2d at 158. Yet "every person who undertakes to deal with an agent is put on inquiry and must discover whether the agent has the authority to complete the proposed act." *West Concord Conservation Club, Inc. v. Chilson,* 306 N.W.2d 893, 896 (Minn.1981).

The trial court found that even if Marsh initially appeared to be acting for Edina Realty, each appellant had notice that Marsh was acting for his own benefit and not as respondents' agent when he sold the CEFNs, and appellants did not discharge their duty to inquire into Marsh's authority to sell CEFNs. The evidence amply supports the trial court's findings.

All appellants knew that Marsh worked as one of Edina Realty's salespersons. Several appellants met him through real estate sales where, admittedly, he acted as Edina Realty's agent. Edina Realty authorized Marsh to sell contracts for deed. However, all of the CEFNs bore the names of Marsh's investment companies rather than Edina Realty's name and all payments came from Marsh. Furthermore, all appellants admitted that no one affiliated with Edina Realty, including Marsh, ever represented that the CEFNs were issued on behalf of Edina Realty or guaranteed by Edina Realty.

Apparent authority terminates when the person dealing with the agent has notice that the agent is acting for his own benefit. Restatement (Second) of Agency, §§ 166, comment b, and 262, comment c (1958). Once appellants had notice that Marsh was the principal in the securities sales, they had a duty to inquire whether he was still acting as an agent of Edina Realty. No appellant ever made any such inquiry. The question of whether inquiry is reasonable is for the finder of fact to determine in

light of experience. *Federal Enter., Inc. v. Greyhound Leasing & Fin. Corp.,* 849 F.2d 1059, 1064 (8th Cir.1988). Again, this evidence supports the trial court's finding of lack of reasonable inquiry.

In essence, appellants seek to hold respondents liable as principal because their name bestowed an aura of reputability on Marsh, and that aura formed part of the reason appellants trusted him. We agree with the trial court that the aura is not sufficient to establish apparent authority.[2] *See Stuteville v. Downing,* 181 Ind.App. 197, 201, 391 N.E.2d 629, 632 (1979).

Because we affirm the trial court on all claims based on actual or apparent authority, appellants' count charging respondents with deceptive trade practices in violation of the Consumer Fraud Act, Minn.Stat. §§ 325F.68–.70, must also fail. *See State v. Mecca Enter., Inc.,* 262 N.W.2d 152, 156–57 (Minn.1977).

## IV.

In addressing the issue of negligent supervision, the trial court found:

> An employer * * * has a duty to prevent employee wrongdoing when the employer has a contractual relationship with a customer which facilitates the employee's wrong.

> *        *        *        *        *        *

[Appellants] Wilcox, James Deems, Romanski and Hanson–Sanford did not buy or sell real estate through Glen Marsh and Edina Realty. Since there was no special relationship between Edina Realty and these [appellants], Edina Realty had no duty to protect them. [Appellants] Semrad, Sherman, Strudwick and Mary Deems did have a contractual relationship with Edina Realty at one time. Their relationship with Edina Realty either terminated before Glen Marsh made certain representations, or their particu-

lar investments are not subject to this litigation. Accordingly, none of the above-mentioned [appellants] have a basis for asserting a claim for negligent supervision.

There remains the claim of Dorothy Halla–Poe.

*        *        *        *        *        *

This Court finds that [respondents] were negligent in supervising Glen Marsh, and that [respondents'] negligence was a proximate cause of [Halla–Poe's] loss. * * * Halla–Poe was negligent in her dealings with Glen Marsh and * * * her negligence was a proximate cause of her loss. * * * Halla–Poe relied on her mother's trust and confidence in Glen Marsh. She made no independent inquiries into the nature of contract equity funding notes; she made no inquiries into the authority of Glen Marsh to offer contract equity funding notes. Any limited inquiry on her part would have revealed that the notes were nothing more than unsecured obligations of Glen Marsh and Five Points Financial Group. Comparing the negligence of the parties, the Court finds that * * * Halla–Poe's negl[i]gence was greater than that of [respondents]. Dorothy Halla–Poe is therefore not entitled to recover on the basis of negligent supervision.

The findings regarding Halla–Poe are not clearly erroneous and we affirm the trial court in all respects as to her claims.[3] We are concerned, however, with the trial court's resolution of the negligent supervision issue as it affects the remaining appellants.

Both parties agree with the trial court that respondents' duty to supervise Marsh was governed by both the Restatement (Second) of Agency § 213 and the Restatement (Second) of Torts § 317. However,

---

**2.** *But see* section IV of this opinion "negligent supervision," regarding the consequences of the "aura of reputability" when coupled with improper supervision.

**3.** The trial court also found that respondents breached their fiduciary duty to Halla–Poe, but not to any other appellant. Judgment was en-

tered for Halla–Poe on the theory of breach of fiduciary duty in an amount equal to the sum of money invested with Glen Marsh, minus payments made by him to January, 1987. Neither party has challenged the court's determinations concerning breach of fiduciary duty on this appeal.

because appellants argue that the court erred in its application of these sections to the facts of this case, we address each in turn.

### a. *Restatement (Second) of Agency § 213*

In *Ponticas v. K.M.S. Inv.*, 331 N.W.2d 907, 910–11 (Minn.1983), Minnesota adopted Restatement (Second) of Agency § 213 which provides:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> \*   \*   \*   \*   \*   \*
>
> (c) in the supervision of the activity.

In *Harrison v. Dean Witter Reynolds, Inc.*, 715 F.Supp. 1425, 1435–36 (N.D.Ill. 1989), the court found that a principal has a duty to supervise its agent based on either its special relationship with the agent, under Restatement (Second) of Torts § 317, or its special relationship with the person harmed by the agent under Restatement (Second) of Agency § 213. The *Harrison* court concluded that since there was no contractual relationship between the injured party and the principal, there could be no liability. *Id.*, 715 F.Supp. at 1436.

The trial court here, relying on *Harrison*, found that section 213 did not apply to any appellant except Halla–Poe, because all other appellants were not Edina Realty's customers when Marsh sold them securities.

We believe, however, that the illustrations to section 213 clearly indicate that liability under that section is not limited to persons in a contractual relationship with the principal. For example:

> The servants of the P railroad have been accustomed to throw wood into an adjacent street for their own use, later picking it up. P acquiesces in this practice although it is negligent as to those passing in the street. A stick of wood so thrown strikes a traveler in the street. P is subject to liability to the traveler.

Restatement (Second) of Agency § 213, illus. 11.

The duty under section 213 is based on the special agency relationship. Unlike the section 317 duty, the duty under section 213 extends beyond the employer's premises and use of the employer's possessions, but it is limited to the principal's activities which are conducted through agents. These are, of course, acts in the scope of employment, and we have already found that Marsh's sales of securities, which form the basis for appellants' complaints, were beyond the scope of his employment.

Under *Marston*, 329 N.W.2d at 310–11, we believe that section 213 liability has effectively become part of respondeat superior liability in Minnesota. Because Marsh's sales of securities were not the type of activity that respondents conducted through their agents, respondents cannot be liable for those acts under section 213. Therefore, we affirm the trial court's finding that respondents are not liable under section 213.

### b. *Restatement (Second) of Torts § 317*

We have now disposed of all theories of liability based in any way upon principles of respondeat superior, acts in the course of employment, statutory liability or liability under principles of agency. There exists, however, a basis for liability that does not require any of those theories.

According to Restatement (Second) of Torts § 317:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> (a) the servant
>
> (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
>
> (ii) is using a chattel of the master, and
>
> (b) the master

(i) knows or has reason to know that he has the ability to control his servant, and

(ii) knows or should know of the necessity and opportunity for exercising such control.

In contrast to liability based on agency principles under section 213, an employer's duty to supervise under section 317 extends to supervision of the employee's acts beyond the scope of his employment, as long as the employee uses things owned by the employer or acts in a place to which the employee has access only because of his status as employee.

The trial court found no violation by respondents of any duty under section 317 because appellants failed to prove that they were harmed by occurrences on Edina Realty's premises, and that Marsh's acts using Edina Realty's property to perpetrate fraud were within Edina Realty's practical control.

We believe, however, that respondents' business operations have special characteristics which make it inappropriate to limit liability solely to acts on premises owned by Edina Realty. Respondents are engaged in the sale of real property. They hired Glen Marsh to conduct the ordinary and necessary activities incident to that business and clothed him with an aura of reputability and trust in the conduct of his duties. The activities of respondents are not confined to "premises" which can be defined and delineated by reference to certain, fixed and identifiable offices, plants or factories. The special nature of respondents' business activities requires that many (perhaps most) of its activities of listing and showing property and assisting buyers and sellers in offers, counter-offers and contracts in connection with the transfer of property will occur on "premises" which are removed geographically from an edifice identifiable as "Edina Realty." Such special business activities permit and require entry of an employee such as Marsh upon "premises" far more varied and geographically diverse than would be the case with an employer who conducted its business activities in a single physical structure.

We are also convinced that the scope of an employer's duty to avoid negligent supervision of its employees must be defined by foreseeability, as in tort law generally. The scope of the employer's duty is "commensurate with the risks of the situation." *Ponticas*, 331 N.W.2d at 912. The employer's duty to avoid negligent supervision extends to all persons who could foreseeably be harmed by an employee's activities on premises to which he has access in his role of employee or through use of objects which the employer owns. *See id.* at 912–13.

Marsh's association with respondents clothed him with an aura of reputability and granted him admittance to many places to which he otherwise may not have had access. A question remains as to whether respondents should have foreseen that Glen Marsh would use that aura and that access to defraud appellants. Edina Realty certainly would have had a duty to "blow the whistle" on Marsh's conduct if it had become aware of the scheme involved in this action. The question, then, is whether Edina Realty had a duty to so supervise him that it would, in some period shorter than five years, become aware of the scheme that harmed the appellants. It is this question, in the context of section 317, which the trial court must address on *remand*. The trial court must also appropriately compare any negligence it may find on the part of respondents with the negligence which it may find on the part of appellants.

## V.

■ Appellants' brief is 53 pages in length, excluding the table of contents, table of citations, appendix, and addenda containing statutes and rules. *See* Minn.R. Civ.App.P. 132.01, subd. 3. The brief has 94 single-spaced footnotes, several of which contain facts and legal arguments of substantial importance to the case.

Unquestionably, the practice engaged in by appellants here is to be discouraged. However, the facts of this case are unusual

enough to convince us that, despite a technical violation of applicable page limits, the imposition of sanctions, as requested by respondents, is inappropriate. There are numerous plaintiffs and even more numerous issues and theories of law. We conclude now that the interests of justice and fairness do not support the imposition of sanctions in this matter.

## DECISION

With respect to all appellants other than Halla–Poe, this matter is reversed and remanded for further consideration and appropriate findings on the charge of negligent supervision of Glen Marsh. The decision of the trial court is affirmed in all other respects.

Affirmed in part, reversed in part and remanded.